510 F.Supp. 81 (1981)
POST NEWSWEEK STATIONS-CONNECTICUT, INC.
v.
TRAVELERS INSURANCE COMPANY, Skating Club of Hartford, and City of Hartford.
Civ. No. H-81-134.
United States District Court, D. Connecticut.
March 2, 1981.
*82 *83 Karl Fleischmann, Henry S. Cohn, Fleischmann, Sherbacow, McWeeney & Cohn, Hartford, Conn., for plaintiff.
Charles F. Corcoran, Steven D. Coppage, Updike, Kelly & Spellacy, Hartford, Conn., for defendants, Travelers Ins. Co. & Hartford Skating Club.
Alexander A. Goldfarb, Corp. Counsel, James F. Meehan, Asst. Corp. Counsel, Hartford, Conn., for defendant, City of Hartford.

RULING ON MOTION FOR PRELIMINARY INJUNCTION
CLARIE, Chief Judge.
This case is before the Court on plaintiff's motion for a preliminary injunction. The plaintiff objects to defendant's insistence that the plaintiff execute an indemnity agreement precedent to entering the Hartford Civic Center Coliseum with television cameras. The defendant claims that the indemnity agreement is mandated by certain pre-existing contractual obligations. The plaintiff argues, in reply, that the restrictions in the indemnity agreement, if upheld, will place a burden upon the newsgathering efforts of local television stations as they attempt to report on the 1981 World Figure Skating Championships. The Court finds that the plaintiff has no constitutional right of special access to this event, and the restrictions are not arbitrary in nature. The contractual provisions at issue, therefore, do not violate the plaintiff's first or fourteenth amendment rights. The motion for a restraining order and preliminary injunction is therefore denied.

Jurisdiction
This Court has jurisdiction in this case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

Facts
World-class amateur skating competition is controlled by the International Skating Union (ISU), a Swiss-based organization. In 1978 the ISU granted certain exclusive television rights to Candid Productions Inc. (Candid), which is associated with the American Broadcasting Company (ABC). These rights include "exclusivity against television news broadcasts of any length which would include video film or videotape coverage of any of the Championships prior to our telecasts." The 1981 World Figure Skating Championships were placed, by the ISU, with the Skating Club of Hartford, Inc. This award was based on a bid submitted by the Skating Club and was subject to the exclusive television rights previously granted to Candid. Consistent with its agreement with the ISU, the Skating Club wrote to local television stations to inform them of Candid's contractual rights. The advisory letter to the television stations was accompanied by a proposed indemnity agreement. This proposed agreement states, in part, that in consideration for entrance to the Hartford Civic Center Coliseum, a television station must agree to refrain from broadcasting television footage of the event until ABC concludes its entire telecast of the championships.[1] Further, *84 the television station must agree to indemnify the Skating Club, and certain other parties, from costs and attorney's fees which may be incurred if the station violates any part of the proposed agreement.
The plaintiff, a local television station, claims that the indemnity agreement represents an unconstitutional attempt to restrict its first and fourteenth amendment rights "to provide immediate reporting of the newsworthy event ...." Plaintiff relies principally upon the case of Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), in support of its position. The defendant, in reply, argues that the primary question to be resolved is whether the plaintiff has a special right of access to information which it does not yet possess.

Discussion of the Law
The Court notes, at the outset, that plaintiff's reliance on Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), is misplaced. In Zacchini, the issue was whether a television station could be held liable in tort for broadcasting the "entire" act of a commercial entertainer. The improper action, in that case, was the station's infringement of the performer's "right of publicity." The controversy revolved around the station's use of film which it legitimately obtained in the course of routine newsgathering. Although Zacchini had objected, at first, to having his event filmed, he did not renew his objection when the film crew appeared one day later. Further, there was no admission charge for his particular performance: his was only one of a number of the events at a county fair. More important, he had not negotiated any form of a broadcasting rights contract with anyone. Thus, there was nothing extraordinary about the station's newsgathering, except for the fact that they had not filmed a naturally occurring news event. Rather, they filmed a staged production by a professional entertainer. They were found liable in tort largely, if not completely, because the broadcast of the "entire" act diminished the commercial value of the performance. 433 U.S. at 570, 97 S.Ct. at 2854. In briefing that case for the United States Supreme Court, the parties, and the amicus curiae National Association of Broadcasters,[2] unqualifiedly agreed that Zacchini could have contracted to protect the commercial value of his act. Thus, Zacchini has no application in this case.[3] The issue before the Court is not whether the plaintiff may be restricted from communicating information it has already obtained; our concern is whether the plaintiff may have special access to that information. This is a critical distinction. See Houchins v. KQED, Inc., 438 U.S. 1, 9, 98 S.Ct. 2588, 2593, 57 L.Ed.2d 553 (1978).
It is clear that the ISU has a legitimate commercial stake in this event, and they, like Zacchini, are entitled to contract regarding the distribution of this entertainment product. Uhlaender v. Henricksen, 316 F.Supp. 1277 (D.Minn.1970). Here, the ISU has imposed certain contractual restrictions on those who would attend the 1981 World Figure Skating Championships.[4] The defendant has represented that *85 these restrictions are universally applicable. That is, no one would be permitted to enter the Civic Center Coliseum with television cameras unless they agreed to execute an indemnity contract. Thus, the plaintiff is seeking access of a type which is denied to the public generally. It is established, however, that the press has no constitutional right of special access to an event such as these skating championships. Houchins v. KQED, Inc., 438 U.S. 1, 9, 98 S.Ct. 2588, 2593, 57 L.Ed.2d 553 (1978); Branzburg v. Hayes, 408 U.S. 665, 684-85, 92 S.Ct. 2646, 2658-59, 33 L.Ed.2d 626 (1972); Dietemann v. Time, Inc., 449 F.2d 245, 249 (9th Cir. 1971) (the first amendment is not a license to trespass); Le Mistral, Inc. v. Columbia Broadcasting System, 61 App.Div.2d 491, 402 N.Y.S.2d 815 (N.Y.Sup.Ct.1978). Here, the plaintiff, as well as the general public, is offered access to the event if it conforms to contractual restrictions.
The question which remains is whether the contractual restrictions could be construed as constitutionally invalid. It is clear that they would be given full effect if the Civic Center were privately operated, Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972), but the Hartford Civic Center Authority, which operates the Civic Center, is a municipal departmental unit of the City of Hartford. See 1 Municipal Code of Hartford § 10 (1980).[5] Therefore, state action exists and renewed attention must be given to the plaintiff's claims that the contractual restrictions unduly burden its first and fourteenth amendment rights.
The degree of scrutiny focused upon the contract provisions depends upon the capacity in which the city is functioning as it operates the Civic Center. First, it is clear that the Civic Center is not intended to exist as a nonprofit institution.[6] By maintaining the Civic Center, the city has entered the commercial marketplace. It is in competition with other, similar facilities. The execution of the contract between the Skating Club of Hartford and the Civic Center Authority was a commercial venture and not an act of governmental decisionmaking. The Court finds, therefore, that in operating the Civic Center the City of Hartford is functioning in a proprietary, rather than governmental, capacity. See Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (a contract dealing with advertising in a public rapid transit system is an example of a city functioning in a proprietary capacity). When a city is found to be acting in a proprietary capacity, lesser federal restrictions are imposed on those actions. Lehman v. City of Shaker Heights, supra (a ban on political advertising in the city's mass transit system was held permissible). See Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) ("when acting as proprietors, States should ... share existing freedoms from federal restraints, including the inherent limits of the Commerce Clause"); Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976); Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961); American Yearbook Co., Inc. v. Askew, 339 F.Supp. 719, 721 (M.D.Fla.), aff'd mem., 409 U.S. 904, 93 S.Ct. 230, 34 L.Ed.2d 168 (1972) (proprietary acts are for the benefit and private advantage of the constituents and the government itself. "When a state exercises its proprietary or business power ... it is subject to no more limitation than a *86 private individual or corporation would be in transacting the same business.")
This Court is guided by Lehman v. City of Shaker Heights in the case at bar: since the city is acting in a proprietary capacity, the contractual restrictions are constitutional if they are not arbitrary or capricious. 418 U.S. at 303, 94 S.Ct. at 2717. The latter determination is effected by weighing the nature of the forum and the conflicting interests involved. Lehman v. City of Shaker Heights, 418 U.S. 298, 302-03, 94 S.Ct. 2714, 2716-17, 41 L.Ed.2d 770 (1974); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).
Unlike Lehman, the forum in this case is a meeting place. However, the meeting place is not being used, here, for the exchange of ideas, at least in the sense that there is no political speech involved on this occasion. It is not disputed that entertainment is news, Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 578-79, 97 S.Ct. 2849, 2859, 53 L.Ed.2d 965 (1977), but the entertainment here is the exposition of an athletic exercise. As such, it is on the periphery of protected speech (for purposes of a balancing of conflicting interests), as opposed, for example, to political speech, which is at the core of first amendment protection. See Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). It is unarguable that there is world-wide attention focused on the events which will take place in the coming days, but first amendment guarantees do not fluctuate in response to the whims of public approval. The relative popularity of the particular speech at issue is not a factor in assessing first amendment protection.
A second factor to be considered is the severity of the restriction imposed upon the plaintiff. In the case at bar, there can be no finding of censorship. The general public has ready access to the event,[7] the event will be reported by newspaper and radio media without any time or manner restriction, and the plaintiff, itself, may attend and report on the championships, subject to the provisions of the indemnity agreement.[8]
Finally, the Court finds that the restrictions imposed upon the plaintiff are not arbitrary. Television broadcasting would have an unusual impact on the entertainment value of this event. That is, figure skating is a uniquely visual sport. Newspaper and radio coverage will not diminish its commercial value; television broadcasting could do so.[9]
Any approach other than upholding this limited restriction could jeopardize the revenue derived from future entertainment contracts. Lehman v. City of Shaker Heights, 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974). Other, similar events would be placed in private arenas where broadcast coverage could be more effectively restricted.
The Court holds, therefore, that the plaintiff has no special right of access to this event, and that the contractual restrictions imposed do not violate the plaintiff's first and fourteenth amendment rights. The motion for a restraining order and preliminary injunction is denied.
So ordered.
NOTES
[1] Two indemnity agreements were proposed by the defendant, but the provisions at issue are substantially the same in both documents. One of the agreements states, in pertinent part,

"In consideration for the Skating Club of Hartford, Inc's, granting permission to agents and employees of
_________________________________________ (hereinafter `Permittee')
 (Insert Name of Television Station)
to enter the Hartford Civic Center Coliseum with television cameras and equipment ... the undersigned ... does hereby represent and promise the following:
1. The permittee will not broadcast ... any of the material or coverage obtained during the championships until after the conclusion of the entire telecast of the event by the American Broadcasting Company (ABC), whether such telecast occurs live or at a later time or date."
[2] The Court notes, en passant, that the plaintiff is a member of this organization.
[3] In making this determination, the Court is expressing no opinion regarding plaintiff's claim that a two-minute broadcast, gleaned from hours of filming, could not be considered a broadcast of an "entire" act. It is conceivable that a two-minute broadcast, focused solely on the top performer of the day, would embody the essence of the commercially valuable performance, and thus could possibly be a broadcast of the "entire" act. See Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 580 n.3, 97 S.Ct. 2849, 2860 n.3, 53 L.Ed.2d 965 (1977) (Powell, J., dissenting). Nonetheless, plaintiff's contrary view is persuasive. It is difficult to perceive significant economic harm running to Candid as the result of a two-minute, local news broadcast. However, the Court is not empowered to pass on the economic wisdom of Candid's seemingly overzealous restrictions. The issue before the Court is not whether Candid needs such protection, but whether they may legitimately contract to obtain it.
[4] See note 1 supra.
[5] At oral argument on this motion, the Corporation Counsel of the City of Hartford indicated that the contract executed by the Director of the Civic Center Authority is presently voidable because it had never been approved by him, as required in the City Charter. 1 Charter of the City of Hartford, Connecticut Ch. 18, § 4(a). The validity of this position is uncertain, see, e. g., 1 Municipal Code of Hartford § 10-26, but, notwithstanding this claim, the Corporation Counsel further represented that the City of Hartford would not now attempt to repudiate the contract. The contract executed by the director acknowledges Candid's exclusive broadcasting rights. Plaintiff's Exhibit 1, at ¶ 22.
[6] The Corporation Counsel represented to the Court that the Hartford City Council was greatly concerned at reports that the Civic Center was incurring operating losses.
[7] Cf. Southeastern Productions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In Conrad, the operators of a municipal theater impermissibly banned a production of the musical play "Hair." In that case, the play was permanently banned from all public viewing. The operators did not impose a "time, place, and manner" restriction, unlike the ISU in this case. Rather, they engaged in total censorship.
[8] The Court notes that the plaintiff has an unrestricted right to broadcast an announcer's report on this event as it takes place. Further, the plaintiffs report may be accompanied by the display of still photographs. See note 1 supra (the indemnity agreement only concerns the presence of television cameras).
[9] But see note 3 supra.