Manchester District Court
No. 88-256

# THE STATE OF NEW HAMPSHIRE

v.

# MICHAEL HODGKISS

November 16, 1989

*Thomas A. Ficarra,* Office of the Manchester City Solicitor, by brief and orally, for the State.

*Backus, Meyer & Solomon,* of Manchester (*Jon Meyer* on the brief and orally), for the defendant.

SOUTER, J. The Manchester District Court (*Capistran,* J.) found the defendant guilty of violating city ordinances prohibiting the encumbrance of sidewalks and posting of signs on city property, based in each instance on conduct urging registration to vote in the 1988 presidential preference primary and espousing the candidacy of Lyndon LaRouche. In this consolidated appeal under RSA 599: 1-c, II, we hold the encumbrance ordinance inapplicable to non-commercial activity and reverse the conviction for its violation; we affirm the conviction for unlawful posting.

The evidence indicated that on February 2, 1988, the defendant, Michael Hodgkiss, stood with an associate on the Elm Street sidewalk next to the Manchester City Hall, distributing pamphlets for Lyndon LaRouche and urging pedestrians to enter the building to register as voters in the coming presidential preference primary. The defendant set up a card table several feet from the curb to hold extra literature and display some signs. To keep rain off the material, he covered the table with a large umbrella, which he held in place with a rope strung between a lamppost and a tree, each maintained by the city. From the rope he also suspended a six-foot cardboard sign variously described as supporting LaRouche or urging voter registration.

In the middle of the afternoon, a police officer told the defendant that city ordinances required a permit for placement of the card table and the large sign suspended from the rope. He explained that the defendant was free to continue distributing literature, but directed him to remove the table, umbrella and sign. The defendant called the ordinances unconstitutional and refused. Soon thereafter another officer appeared with copies of the two ordinances in question, Manchester Ordinances Sections 11-40 and 22-35, and attempted to read them to the defendant, who is said to have responded by shouting that the police were "commies" behaving like the K.G.B. The police then arrested him for disorderly conduct and later charged him with violating the two ordinances. Although the police removed the table, umbrella and sign, LaRouche

supporters returned to the site and handed out literature later in the afternoon.

In the district court, four charges were consolidated for trial. The defendant was acquitted on a motor vehicle complaint unrelated to the matters now under appeal. Although he was convicted of disorderly conduct, this charge was dismissed without objection from the State after appeal to the superior court for trial *de novo*. *See* RSA 599:1 (Supp. 1988). The remaining convictions, for violating the two ordinances, have come to us on direct appeal under RSA 599:1-c, II.

The charge of "unlawfully encumber[ing] the sidewalk in front of City Hall on Elm Street with a table and large patio umbrella" was brought under Manchester Ordinances Section 22-35:

"Section 22-35. Encumbrances prohibited generally.

(a) No person shall encumber the street or sidewalk before his place of business, or elsewhere in the city, with any boxes, shelves, stands, merchandise or other things, excepting that the board of mayor and aldermen may grant a license to any person or persons to use and occupy a portion of the street or sidewalk for the purpose of conducting thereon street fairs or other community events. Each such license shall contain the following provisions:

. . . .

(2) Each license shall allow the encumbering of no more than one-half of the sidewalk area immediately adjacent to the building so that a minimum of one-half of the sidewalk is maintained free and clear for pedestrian traffic . . . ."

The defendant challenges both the applicability and constitutionality of this ordinance, arguing that it should be read to prohibit only encumbrances that would actually create impediments to the movement of people or vehicles, of which there was said to be no evidence, and contending that on any other reading the ordinance would unconstitutionally restrict political speech.

We reach only the issue of applicability, although without accepting the defendant's analysis on this point. Assuming *arguendo* that a conviction under the ordinance would require proof that pedestrians were actually impeded, we could not say that the record precluded such a finding, since there was evidence that the card table extended six-and-a-half feet from the curb into the walkway on a busy sidewalk.

■ The fact that we do not accept the defendant's argument against the ordinance's applicability does not, however, bar us from considering other grounds on which it may be inapplicable, for we follow a strong policy against reaching a constitutional issue in a case that can be decided on a nonconstitutional ground. *Bedford Residents Group v. Town of Bedford*, 130 N.H. 632, 638, 547 A.2d 225, 229 (1988); *White v. Town of Wolfeboro*, 131 N.H. 1, 3, 551 A.2d 514, 515 (1988) (citing *New Hampshire Ins. Co. v. Duvall*, 115 N.H. 215, 218, 337 A.2d 533, 535 (1975)); *Crowell v. Benson*, 285 U.S. 22, 62 (1932); *see also Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). Thus, even when a dispositive statutory issue is not raised by the parties, the court may consider it as the way to avoid a needless constitutional decision. *Cf. School Dist. #42 v. Murray*, 128 N.H. 417, 419, 514 A.2d 1269, 1271 (1986) (court reached issue not raised below lest it usurp primary jurisdiction of a legislatively-empowered appeals board); *see also Blonder-Tongue v. University Foundation*, 402 U.S. 313, 320 n.6 (1971); *Ashwander v. Tennessee Valley Authority supra.*

■ As we read the ordinance, the activities it is apparently meant to prohibit and regulate do not include the sort of political promotion in which the defendant was engaged. While the ordinance's topic heading speaks of prohibition "generally," the first clause of the text speaks of encumbering streets or sidewalks before a person's "place of business" or elsewhere, thereby carrying the suggestion that the ordinance is addressed to merchants, an implication confirmed by the description of the prohibited encumbrances as "boxes, shelves, stands, merchandise or other things." Although, on its face, "other things" is broad language, there is a common rule that a general statutory term is to be understood to cover further instances comparable to any specific examples listed with it, *see State v. Small*, 99 N.H. 349, 350, 111 A.2d 201, 202 (1955), and in the absence of a contrary indication we should accordingly infer that the catch-all phrase was only intended to prohibit placement of the subjects and equipment of commerce in the travelled ways.

■ This reading is confirmed by the provision that even licensed encumbrances may not cover more than one-half of a sidewalk "immediately adjacent to the building," with its probable reference to commercial property where building and sidewalk are characteristically contiguous. Finally, the provision for licensing occasioned by "street fairs" confirms the apparent object of regulating commercial activity, while the reference to "other

community events" carries no suggestion of any intent to regulate individual political activity of the sort in question here. This being so, the ordinance has no application to the acts charged in the complaint for violating section 22-35, which must be dismissed. *See Frizzell v. Charlestown*, 107 N.H. 286, 288, 220 A.2d 742, 744 (1966) (statutory interpretation looks to purpose apparent from language and legislative history).

As we turn to consider the conviction for violating section 11-40 by the act of displaying the large sign on the rope strung between the lamppost and tree, our first task, again, is to enquire into the intended scope of its prohibition, as this may be revealed by the text:

"Section 11-40. Posting notices. .

No person shall post or affix any notice, poster or other paper or device, calculated to attract the attention of the public, to any lamppost, public utility pole or shade tree, or upon any public structure or building, except as may be authorized or required by law."

On first reading, this ordinance seems to prohibit posting and affixing not only to public property in the instances of lampposts and public buildings, but to utility poles and shade trees, whoever their owners may be. But the fact that the references to poles and trees are sandwiched between examples of public property raises the question whether it is only publicly-owned poles and trees that are meant to be covered. *See Home Gas Corp. v. Strafford Fuels, Inc.*, 130 N.H. 74, 82, 534 A.2d 390, 395 (1987) (*noscitur a sociis*). The issue, however, is conceded by the city, which takes the position that the purpose of the ordinance is "to prohibit the use of city owned posts and trees" for the display of signs and notices. We therefore so construe the ordinance and need not question whether constitutional problems would otherwise justify this construction of the scope of the regulation. *See State v. Smagula*, 117 N.H. 663, 666, 377 A.2d 608, 610 (1977); *Crowell v. Benson, supra* at 62.

While such a general prohibition against posting on public structures might be aimed either at protecting property from physical damage to its fabric, or at preventing undesirable visual displays, we infer that enactment of the Manchester ordinance was prompted by the latter object, judging from its application only to materials "calculated to attract the attention of the public." And although this concern about visual impact might be directed either at eliminating safety risks created by signs that distract the attention of drivers and pedestrians, or at preventing disfigurement

of public structures and the spaces they define, the city has not invoked safety as an object of the ordinance, and we will accordingly confine our consideration of the ordinance's justification to its obvious objective of preserving the appearance of the listed public structures and their environs.

We should note that the phrase confining application of the ordinance to postings calculated to attract public attention probably will not impose much of a practical limitation, given the difficulty of imagining any posted or affixed notice that would not appear calculated to attract the attention of someone going by. We assume, therefore, that most if not all forms of posting or affixing by individuals on the enumerated structures are forbidden. *See United States v. Grace,* 461 U.S. 171, 176 (1983). In so concluding we are, of course, ruling out, for this case, any significance in the ordinance's exception for such posting "as may be authorized or required by law." The record fails to indicate what postings, if any, may be so authorized or required, or have actually occurred in accordance with this exception, and neither party's brief has claimed that such administrative discretion as may be created by this exception should have any significance for our decision.

Under the ordinance as so construed, we cannot ascribe much weight to the defendant's argument that its prohibitions did not reach his conduct, merely because he did not affix the sign so as to touch the tree and lamppost directly. If the city's trees and posts could be used with impunity to anchor ropes for the display of signs and posters, the ordinance would be useless to guard against the visual defilement of any public structure suitable for supporting a banner. And since the result of attaching a sign to public structures indirectly by a cord suspended between them would be no less an eyesore than attaching the same sign immediately to a wall or column, the prohibition was probably meant to cover the former method of display. Prohibition of so-called indirect means of affixation is, therefore, reasonably within the ambit of the ordinance, which the trial judge correctly held applicable to the defendant's conduct.

The aesthetic objective of the ordinance is equally to the point in addressing a related, and constitutionally significant, question about its scope, whether the justification for prohibiting the posting or affixing turns in any way on the content of the expressive activity that the ordinance restricts. The answer rests on the same reasoning that led us to conclude that the concern for public appearance supports a construction barring virtually all posting by private citizens, directly or indirectly, on the public structures

mentioned. Consistently with this concern, the text provides no authority for distinguishing one posting from another based on the meaning of any statement that might be contained in material displayed, or on the content or value of any subject that might be represented on it. Nor does the record contain any indication that a decision to enforce the ordinance has ever rested on considerations of meaning or content. Because the apparent justification for the prohibition thus turns entirely on the unsightliness of postings as such, considered without regard to the substance of any message or depiction, the ordinance qualifies as a content-neutral regulation, *see City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48 (1986), by entirely prohibiting the attachment of notices and the like to the public structures to which it applies, *see Perry Education Association v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

In this appeal, the legitimacy of the ordinance as we have construed it is an issue solely of federal law. Although the defendant's pleadings in the trial court contained a passing reference to the State, as well as the National, Constitution, his reliance here is entirely upon the first amendment, as applied against the States through the fourteenth. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

In passing on this federal issue, we rest on principles enunciated in two leading cases. *Perry Education Association v. Perry Local Educators' Association supra* held that the appropriate standard for reviewing a content-neutral time, place or manner restriction on speech or expressive activity on public property depends on whether the public place or facility subject to regulation is a quintessential public forum, like a sidewalk or park, or an area provided by the government to serve as a public forum, or is merely public property without traditional or designated character as a forum for public expression. *Perry Education Ass'n*, 460 U.S. at 45–46. With respect to expressive conduct in places falling within the third category, the Court emphasized that the

"'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' *United States Postal Service v. Council of Greenburgh Civic Assns.*, [453 U.S. 114, 129 (1981)]. In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. 453 U.S., at 131, n.7. As we have stated on several

occasions, ""'[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.""' *Id.*, at 129–30. . . ."

*Perry Education Ass'n,* 460 U.S. at 46. (Further citations omitted.)

The second recent leading case bearing on the issue before us, and controlling its resolution, is *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789 (1984), upholding a Los Angeles ordinance prohibiting posting on public property, which had been applied to bar attaching political signs to municipal utility poles and their support wires. The Court there recognized that the Los Angeles lampposts fell within *Perry's* third category, since they were not forums for public communication either by tradition or designation, and could be reserved by the State for their intended purposes. *Id.* at 814–15. *But see id.* at 815 n.23 (*Perry* distinctions to be used with care and caution). Although the Court noted *Perry's* statement of the criteria to be applied in reviewing such prohibitions (reasonable, not an effort to suppress views), it scrutinized the ordinance before it under the standard articulated for reviewing viewpoint-neutral regulation of symbolic speech, which

"'is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'"

*Id.* at 804–05 (quoting *United States v. O'Brien,* 391 U.S. 367, 377 (1968)). The Court went on to indicate that an ordinance passing each of these tests might still be invalid as applied to non-forum public property "if the remaining modes of communication are inadequate." *Id.* at 812 (citations omitted). We will follow the same composite standard in examining Manchester's similar ordinance here.

In light of *Vincent,* we need not dwell at length on the character of the ordinance as an exercise of the government's constitutional power, justified as furthering a significant governmental interest unrelated to the suppression of free expression. The city's exercise of statutory authority, *see* RSA 47:17, VII, :17, XIV (1971 and Supp. 1988); RSA 31:51, to legislate by ordinance on the subject in question exemplifies the exercise of police power recognized as

legitimate in *Vincent* and cases there cited, *City Council v. Taxpayers for Vincent*, 466 U.S. at 805, and justified as furthering a substantial public interest in preventing visual assault by an accumulation of signs on public property, *id.* at 807. As in *Vincent*, the city's interest involved in the instant case is unrelated to the suppression of free expression as such, *see id.*, and the very facts that the ordinance is content-neutral and concerned with structures having no traditional function in providing forums for display would weaken any suggestion that the city's real concern is to inhibit speech.

The remaining criteria, however, provoke more discussion. Although *Vincent* quoted *O'Brien*'s statement that the scope of the regulation in question must be no greater than is "essential to the furtherance of [the] interest" by which the government would justify the limitation on expressive activity, *City Council v. Taxpayers for Vincent*, 466 U.S. at 805, the *Vincent* opinion makes it clear that a content-neutral regulation limiting expressive activity on non-forum public property is tailored narrowly enough if it is not "substantially broader than necessary" to protect the interest, *id.* at 808. An even more recent opinion on the permissible scope of content-neutral time, place or manner restrictions describes this test as forbidding the government to "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward v. Rock Against Racism*, 109 S. Ct. 2746, 2758 (1989).

In applying this standard, we find nothing unduly broad, on the face of it, about forbidding all attachments of notices, posters and signs to public structures, since the evil to be remedied is the visual pollution caused by the attachments themselves. "By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy." *City Council v. Taxpayers for Vincent*, 466 U.S at 808 (footnote omitted). That is, the entire burden on expression is limited to the elimination of signs posted on public structures, and no portion of that burden fails to serve the city's substantial interest in eliminating visual blight on its non-forum structures.

■ The defendant seeks to counter this conclusion with a variety of arguments, and although we will address them seriatim, it is well to sound one preliminary note of caution. As will be seen, the defendant variously argues that his particular sign display should not, and cannot be prohibited without in some sense suppressing the exercise of protected activities. The cumulative effect of these arguments is to suggest, without actually stating, that the

ordinance must not only be tailored narrowly enough to avoid placing a "substantial portion of the burden on speech [that] does not serve to advance its goals," *Ward v. Rock Against Racism supra*, but must qualify as the least restrictive means of realizing its legitimate aesthetic objective. Suffice it to say here that *Ward*, which was decided following the argument in this case, conclusively rejected this standard for judging a content-neutral, time, place, or manner regulation, as distinguished from one that is content-based. *Ward v. Rock Against Racism, supra* at 2758 n.6. "[A] regulation of the time, place or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but . . . it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation supports a substantial government interest that would be achieved less effectively absent the regulation.' *United States v. Albertini*, 472 U.S. 677, 689 (1985); *see also Community for Creative Non-Violence*, [468 U.S.] at 297. . . . So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward v. Rock Against Racism, supra* at 2757–58 (footnote omitted).

With this preface, we turn to the defendant's specific arguments that the ordinance needs narrower tailoring. He maintains, first, that language in the *Vincent* opinion indicates that his sign display is beyond the government's power to prohibit, and he argues, second, that the display is inseparable or undistinguishable from other activity concededly protected by the first amendment.

The specific language that he invokes from *Vincent* occurs in the Court's discussion of the distinctions between the circumstances then under consideration and the facts of the earlier case of *Schneider v. State (Town of Irvington)*, 308 U.S. 147 (1939), which held that ordinances enacted to prevent littering swept too broadly in forbidding the distribution of leaflets that their recipients might subsequently cast aside. The Court in *Schneider* had reasoned that the discouragement of littering must be addressed more narrowly, as by prosecution for littering itself, *id.* at 160–61, leaving the original distributors free to serve their interests in free communication by giving their literature to anyone willing to receive it. In explaining why *Schneider* was no help to the sign posters in *Vincent*, the Court observed that the distribution protected in the earlier case "continued only while the speakers or distributors

remained on the scene [, whereas in *Vincent*] appellees posted dozens of temporary signs through an area where they would remain unattended until removed." *City Counsel v. Taxpayers for Vincent*, 466 U.S. at 809. The defendant quotes this language to argue that his use of public structures to exhibit his sign was protected because the display would last only as long as he remained on the scene.

We are unable, however, to read so much into this statement. To be sure, it contrasts *Schneider*'s temporary expressive activity with *Vincent*'s more extended visual defilement. But the defendant loses sight of the fact that *Schneider*'s activity was held not to amount to littering that could be prohibited, whereas *Vincent*'s posting was held in itself to violate a governmental interest that justified the blanket prohibition in question. Nowhere did the Court say that non-forum public structures must be made available for posting signs that would remain attached no longer than those who post them might remain nearby, engaged in protected activity like speaking or distributing pamphlets to pedestrians, and it is difficult to see how any such suggestion could survive a reading of the remainder of the Court's discussion, which concludes with these words:

> "With respect to signs posted by appellees, however, it is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape. In *Schneider*, an antilittering statute could have addressed the substantive evil without prohibiting expressive activity, whereas application of the prophylactic rule actually employed gratuitously infringed upon the right of an individual to communicate directly with a willing listener. Here, the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself. In contrast to *Schneider*, therefore, the application of the ordinance in this case responds precisely to the substantive problem which legitimately concerns the City. The ordinance curtails no more speech than is necessary to accomplish its purpose."

*Id.* at 810. In sum, we understand the point of the discussion to be that in *Schneider* two separate activities were in question, and the unprotected littering could be prohibited without penalizing the protected distribution. *Vincent*, in contrast, was concerned with one activity alone, posting signs on public property and its appurtenances, a medium of expression that itself fell within the scope of what the government's aesthetic interest justified it in preventing.

*Vincent,* however, did anticipate the defendant's argument in another respect. The defendant's claim that the ordinance is too broad, inasmuch as it prohibits him from affixing a sign to public structures even for the duration of his own presence nearby, can be seen as a way of making a policy argument that his sign display could have been allowed without surrendering the city's whole aesthetic interest. But as the court pointed out in *Vincent,* the plausibility of such an argument is not equivalent to a constitutional sanction for the defendant's activity, *City Counsel v. Taxpayers for Vincent, supra* at 816-17. Actually, its plausibility is subject to question, since there is reason to believe that an exception for all such temporary postings might render the ordinance ineffective to accomplish its legitimate object, *see City Counsel v. Taxpayers for Vincent, supra* at 816. But even if we assume that penalizing the defendant's display was a comparatively minimal blow against visual pollution, "that fact is beside the point, for the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in a particular case." *Ward v. Rock Against Racism,* 109 S. Ct. at 2759.

In the defendant's second category of reasons for holding the scope of the ordinance insufficiently narrow, he argues that in penalizing his sign display the ordinance is in fact penalizing clearly protected activity. The first example of this approach is his claim that hanging his sign above the sidewalk was all of a piece with his acts of advocacy on the sidewalk itself, from which it follows for him that any restriction on the right to suspend his sign between the lamppost and tree abridged his right to pass out leaflets, as recognized in *Schneider v. State (Town of Irvington),* 308 U.S. 147.

Facts, however, stand in the way of this effort to redefine the issue. Posting a sign is one act; distributing a leaflet is another. People may be, and they commonly are, importuned to accept leaflets without any exhibition of posted slogans. The most that can be said in the abstract is that a message attached to a lamppost may complement the force of a leaflet, but this does not mean that the two communicative acts may not be legitimately seen as distinct, as in the now-familiar analysis turning on the fact that posting itself creates the visual blight that the government is empowered to prevent, whereas distributing the leaflet to a willing recipient is not, without more, an act of littering that the city has the power to punish. *City Council v. Taxpayers for Vincent,* 466 U.S. at 809-10. If, indeed, it were sound to argue that associating

the posting with the distribution of leaflets merges the posting into the protected status of the distribution, then it would be equally reasonable to claim a right to employ sound trucks to broadcast high volume reinforcements of the leaflets' message, contrary to *Kovacs v. Cooper, Judge,* 336 U.S. 77 (1949), on the theory that the raucous reinforcement was integral to effective distribution. And by a parity of reasoning the defendant would gain a right to "throw[ ] [political] literature broadcast in the streets," contrary to dicta in *Schneider v. State (Town of Irvington), supra* at 160–61, on the theory that prosecution of littering would discourage protected distribution. And so, by such a process of association, anyone engaging in a protected activity would be able to insulate blatant nuisances from abatement.

A comparable unwillingness to distinguish between significantly different instrumentalities of communication infects the defendant's argument that his suspended sign was the virtual equivalent of the placard he might concededly have carried by hand, or of the display of a message on one's clothing, which was held to be protected in *Cohen v. California,* 403 U.S. 15 (1971). But the attempt to analogize these activities ignores the fact that the public owner of the lamppost and the tree has reserved them for non-expressive purposes, whereas the placard would presumably belong to the person who carried it on the sidewalk forum, just like the jacket on which Cohen had written his opinion of the draft. The right to paint a message on one's own jacket does not entail the right to disfigure public buildings, trees and lampposts with signs and posters. We thus reject the arguments for identifying such postings with other, distinct and protected acts, and we stand by the conclusions reached above, that the ordinance does not burden any expressive activity beyond what is necessary to achieve its substantial and legitimate goal, and is therefore tailored with sufficient limits to satisfy first amendment standards.

The remaining *Vincent-O'Brien* requirement is that there be adequate alternative modes for communicating the message or representation that would otherwise have been displayed by the forbidden posting, and on this point the record casts no doubt on the constitutionality of the ordinance. It imposes no restriction on the right to address pedestrians on the sidewalks adjacent to the protected structures, or on the right to distribute handbills to those who wish to take them. The defendant, indeed, admits that he was never threatened with any restriction on his right to pass out literature, whether favoring voter registration or Lyndon La-Rouche, and the evidence shows that other LaRouche supporters

distributed leaflets to people in front of the city hall after the defendant's arrest. It is thus beyond doubt that the defendant and his associates had the unrestricted opportunity to solicit the attention of the same pedestrians to whom the sign was addressed, and there is no suggestion that restrictions imposed by the city or by any other unit of government had the effect of limiting the access of would-be sign posters to any other conventional medium of communication.

The *O'Brien-Vincent* criteria being thus satisfied, the application of the ordinance must be seen as constitutional and the conviction for its violation affirmed.

*Reversed in part; affirmed in part.*

All concurred.