Hillsborough-northern judicial district
No. 2002-786

## HIPPOPRESS, LLC

v.

## SMG (A PENNSYLVANIA PARTNERSHIP) d/b/a SMG OPERATIONS & a.

Argued: October 30, 2003
Opinion Issued: December 8, 2003

*Boutin & Associates, P.L.L.C.*, of Londonderry (*Brenda E. Keith* on the brief and orally), for the plaintiff.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Alexander J. Walker, Jr. & a.* on the brief, and *Mr. Walker* orally), for defendants SMG and The City of Manchester.

*Malloy & Sullivan, P.C.*, of Manchester (*Gregory V. Sullivan* on the brief and orally), for defendant The Union Leader Corporation.

*Edward T. Clancy*, of Dover, on the brief, for the New Hampshire Civil Liberties Union, as *amicus curiae*.

BRODERICK, J. The defendants, SMG, the City of Manchester (City) and the Union Leader Corporation (Union Leader), appeal an order of the Superior Court (*Brennan*, J.) ruling that SMG violated both Part I, Article 22 of the New Hampshire Constitution and the First Amendment of the United States Constitution by not allowing the plaintiff, HippoPress, LLC (HippoPress), to distribute its newspaper in the Verizon Wireless Arena (arena). HippoPress cross-appeals that part of the order ruling that SMG was not a "state actor" for purposes of 42 U.S.C. §§ 1983 and 1988 (2000). We reverse in part and affirm in part.

The record supports the following facts. The City owns the arena, a large multi-purpose sport and entertainment venue located in downtown Manchester. SMG is the country's largest facility management company, specializing in managing and operating stadiums, arenas and convention centers. The City and SMG entered into a "Management Agreement" (agreement), which required SMG to staff, manage, operate and maintain the arena. Article 5.2.10 of the agreement provides that SMG "shall, subject to the overall approval of [the City], negotiate, execute and perform all contracts . . . for the use of Advertising space in or about the [arena] and all Advertising rights of whatever kind or nature related to the [arena]." Under this provision, SMG entered into a contract with Union Leader, which provided that: (1) Union Leader would be the exclusive newspaper sponsor for the arena; (2) SMG would not enter into advertising signage agreements with any other newspapers; and (3) Union Leader would have the exclusive right to sell and distribute newspapers within the arena.

HippoPress publishes a weekly newspaper containing general local news, political and editorial comment, and entertainment news. HippoPress requested permission from SMG to distribute its newspapers by racks or vending machines inside the arena. Because SMG had previously granted Union Leader the exclusive right to sell and distribute newspapers there, SMG denied the request.

Prior to the arena's grand opening, HippoPress sought a temporary restraining order to require SMG to permit distribution of its newspaper in the building, as well as preliminary and permanent injunctions enjoining SMG from preventing distribution of its newspaper there in the future. In denying a temporary restraining order, the court found that the arena was neither a "traditional public forum" nor a "designated public forum." Therefore, SMG could regulate access to the building provided that "the regulation on speech [was] reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." According to the court, SMG's contract with Union Leader was a reasonable attempt to increase the profitability of the arena and was not the result of arbitrary or capricious conduct. SMG and the City moved unsuccessfully to dismiss the remainder of HippoPress' claim.

The case went to trial in the superior court, which found that "[t]he City's purpose in establishing the Arena [was] to provide revenue and economic vitality to the City through ticket sales and other indirect economic benefits." Contrary to its earlier ruling on the temporary restraining order, the court found that "the exclusive contract for distribution of the Union Leader newspaper in the City Arena open[ed]

the door to the First Amendment and the Constitutional rights of competing newspapers ... [and] transformed the City Arena from a non public forum to a public forum for competing newspapers." The court, citing *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 535 (1980), stated that in a public forum, "the first amendment allows reasonable, content-neutral regulation of the time, place and manner of expression ... where such regulation narrowly tailored furthers significant government interests, and does not foreclose other opportunities for expression."

Under this standard, the court determined that the exclusive newspaper distribution contract between SMG and Union Leader was not a reasonable regulation and that it foreclosed other opportunities for expression. Consequently, the court ordered the City to either remove Union Leader vending machines from the arena, thereby reinstating the arena as a nonpublic forum, or establish reasonable criteria for the application and installation of vending machines for newspapers interested in distributing their papers in the arena, including Union Leader and HippoPress.

The court also addressed HippoPress' claim for attorney's fees under 42 U.S.C. §§ 1983 and 1988. Section 1983 grants individuals a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In actions to enforce 42 U.S.C. § 1983, courts "may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988. The court, citing *Jerry's Sport Center, Inc. v. Novick*, 122 N.H. 636 (1982), stated that "absent a showing that the State's conduct amounted to joint participation with a party or that the private action and the State's conduct had a sufficiently close nexus, mere State participation will not constitute state action." The court found that the "City was not a party to the contract [between SMG and Union Leader], had no knowledge of the contract nor did [it] participate in any way in the negotiations of the contract. The mere general overall approval of all contracts does [not constitute] conduct which rises to the level of state action required under [42 U.S.C. §] 1983."

The primary question for our review is whether the exclusive newspaper distribution contract between SMG and Union Leader violates HippoPress' rights under Part I, Article 22 of the New Hampshire Constitution or the First Amendment of the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Petition of Brooks*, 140 N.H. 813, 817 (1996). We first consider the parties' contentions

under the New Hampshire Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), citing decisions of the federal courts only to aid in our analysis. *Id.* at 232-33.

This court reviews the trial court's rulings on mixed questions of law and fact under a clearly erroneous standard. *Cadle Co. v. Bourgeois*, 149 N.H. 410, 415 (2003). If, however, the trial court misapplies the law to its factual findings, we review the matter independently under a plain error standard. *Id.* Questions of law are reviewed *de novo*. *Duffy v. City of Dover*, 149 N.H. 178, 181 (2003).

The defendants contend that the trial court erred by finding state action sufficient to support a violation of HippoPress' State and federal constitutional rights, despite finding insufficient state action to support a violation of 42 U.S.C. § 1983. They argue that no state action existed. HippoPress contends that the trial court erred by not finding state action sufficient to support its 42 U.S.C. § 1983 claim. In the alternative, it argues that state action is not necessary to find a violation of Part I, Article 22 of the New Hampshire Constitution. We conclude that the trial court erred by finding state action under the facts of this case, and that state action is necessary for a violation of Part I, Article 22 of the New Hampshire Constitution.

█ It is well established that state action is an essential prerequisite to finding a violation of either Part I, Article 22 of the New Hampshire Constitution or the First Amendment of the United States Constitution. *See State v. Carroll*, 138 N.H. 687, 691 (1994); *In re Certain Scholarship Funds*, 133 N.H. 227, 229-30 (1990). Similarly, 42 U.S.C. § 1983 requires action that is fairly attributable to the State. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Yeo v. Town of Lexington*, 131 F.3d 241, 248-49 (1st Cir. 1997), *cert. denied*, 524 U.S. 904 (1998). The state action inquiry has consistently been treated the same under the Federal Constitution and 42 U.S.C. § 1983. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 837-38 (1982); *United States v. Price*, 383 U.S. 787, 794 n.7 (1966); *Barrios v. AEELA*, 84 F.3d 487, 491 (1st Cir. 1996).

█ State action may be attributed to a private actor, such as SMG, if: (1) there is a financial or regulatory nexus between the private actor and the government, which compelled the private actor to act as it did; (2) the private actor assumes a traditionally public function; or (3) a symbiotic relationship exists between the private actor and the government. *See Ponce v. Basketball Feder. of Com. of Puerto Rico*, 760 F.2d 375, 377 (1st Cir. 1985).

■ In order to establish state action under the nexus test, HippoPress needed to demonstrate that "there [was] a sufficiently close nexus between the [City] and the challenged action of [SMG] so that the action of the latter may be fairly treated as that of the [City] itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). "Mere approval of or acquiescence in the initiatives of [SMG] is not sufficient." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982). The City "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [City]." *Id.* at 1004. HippoPress needed "to point to the specific act or actions of the [City] which in fact motivated [SMG's] action." *Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, 450 (1st Cir. 1983). In this case, the trial court found that the City had no knowledge of the contract, showed no interest in the contract, and did not participate in any way in the negotiation of the contract between SMG and Union Leader. These findings foreclose a financial or regulatory nexus that compelled SMG to enter into the contract with Union Leader.

■ HippoPress also argues that SMG assumed a traditionally public function by managing the arena. In order to prevail on such a theory, HippoPress needed to "show more than the mere performance of a public function by a private entity; [it needed to] show that the function is one *exclusively* reserved to the State." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19 (1st Cir. 1999). "[O]nly those undertakings that are uniquely sovereign in character qualify as traditional and exclusive state functions. . . . [W]hile many functions have been traditionally performed by governments, very few have been exclusively reserved to the State." *United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902, 907 (4th Cir. 1995) (quotations omitted). "[T]he short list of activities that have been held to satisfy this demanding criterion includes 'the administration of elections, the operation of a company town, eminent domain, [and] peremptory challenges in jury selection.'" *Perkins*, 196 F.3d at 19. Similarly, "[t]he provision of education, police protection, and prisons are public functions that, when 'privatized,' still retain their public nature." *Rodriguez-Garcia v. Davila*, 904 F.2d 90, 98 (1st Cir. 1990) (quotation omitted).

In the closest analogy to the present case, the United States Supreme Court found state action present in the management of a municipal park. *Evans v. Newton*, 382 U.S. 296 (1966). *Evans*, however, is best understood to involve state action not because the park or its management assumed a

traditionally public function, but because the government "remain[ed] entwined in the management or control of the park" after it had been transferred into private hands. *Id.* at 301. In *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 159 n.8 (1978), the Court expressed "doubt that [*Evans*] intended to establish [the] broad doctrine [that the operation of a park for recreational purposes is an exclusively public function] in the teeth of the experience of several American entrepreneurs who amassed great fortunes by operating parks for recreational purposes." HippoPress has failed to establish any facts upon which we could conclude that the management and operation of a commercial arena is a function that has traditionally been the exclusive domain of the State.

■ The question of whether a symbiotic relationship exists between SMG and the City is somewhat closer. Under this standard, the actions of SMG can be attributed to the City if it "so far insinuate[s] itself into a position of interdependence with [SMG] that it [should] be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Pkg. Auth.*, 365 U.S. 715, 725 (1961). This inquiry focuses not on the challenged conduct, but "on the nature of the overall relationship between the [City] and [SMG]." *Perkins*, 196 F.3d at 21. Factors accorded particular weight in this inquiry are whether the private entity is independent in the conduct of its day-to-day affairs and whether the private entity and the public entity share in the profits derived from the private entity's challenged conduct. *Id.* Under this totality of the circumstances test, HippoPress points to the following factors in support of its argument: (1) the City owns the arena; (2) the City retains overall approval rights under the agreement; (3) the arena is a vital part of the City's downtown economic development plans; and (4) SMG and the City share profits.

The fact that the City owns the arena is of no help to HippoPress because a symbiotic relationship is based on the nexus between SMG and the City, not the nexus between the City and the arena. Likewise, the fact that the City wants the arena to be successful in providing economic stimulus to the downtown area does not assist HippoPress, because it is the relationship between SMG and the City that is at issue, not the relationship between the City and its plans for the downtown area.

The fact that the City retains overall approval rights under the agreement is evidence of possible joint participation or interdependence. In this case, however, the City has not engaged in any decision-making processes with SMG nor has the City taken part in the management or operation of the arena. The relationship between SMG and the City has been based on completely arms-length transactions. For example, if the

City wants to hold a graduation or inauguration at the arena, it must contact SMG and go through the same application process as any other potential user. Likewise, if SMG needs a permit from the City for police or fire protection for a particular event, it must go through the same process as any other applicant. Independence of the private entity in conducting its day-to-day affairs has been recognized as the most important factor in determining whether a symbiotic relationship exists. *See id.*

To prove a symbiotic relationship, HippoPress also points to the profits shared by the City and SMG. When analyzing profit-sharing we look only to the "profits arising from the challenged conduct." *Id.* In addition, the challenged conduct "must be indispensable to the financial success of the joint project." *Id.* In this case, although the City wants the arena to be successful, both in revitalizing the downtown area and generating income, HippoPress has not demonstrated that the challenged contract between SMG and Union Leader is indispensable to the financial success of the joint project. The City's profit on its $50 million financing of the arena was capped at a relatively minimal $1.2 million over thirty years. HippoPress failed to show that this $1.2 million was indispensable to the financial success of the joint project, let alone that portion of the $1.2 million represented by the contract between SMG and Union Leader. At trial, the finance officer for the City testified that the arena was financed because of the economic development it would bring to the downtown area and not because the City was "looking to make money on the building." In fact, the City financed the arena despite the fact that there was no guarantee that the City would receive any of the potential $1.2 million. Moreover, under articles seven and nine of the agreement, SMG guaranteed the City that the City would not be liable for any operating losses, which insulated the City from any adverse financial consequences resulting from the operation of the arena. The unequal distribution of profits and the assumption of all losses by SMG is further evidence that the City and SMG were not joint participants or interdependent. *See* 59A AM. JUR. 2D *Partnership* § 155 (2003) (stating that the general rule is that an agreement to share losses as well as profits is essential to the existence of a partnership). The potential monetary return that the contract could generate for the City did not transform the otherwise autonomous SMG into a state actor. *See Center for Bio-Ethical Reform v. Comcast-Spectacor, Inc.*, No. Civ. A. 98-CV-4975, 1999 WL 601014, at *2–3 (E.D. Pa. July 29, 1999). "The test is one of interdependence and joint participation, rather than one of financial enrichment." *Rodriguez-Garcia*, 904 F.2d at 98.

■ HippoPress has failed to establish state action under any of the three analytical frameworks outlined above. Therefore, we find that the trial court erred when it found state action sufficient to support a violation of Part I, Article 22 of the New Hampshire Constitution. Because the Federal Constitution affords HippoPress no greater protection than does the State Constitution under these circumstances, *see Rendell-Baker*, 457 U.S. at 839-43, we reach the same result under the Federal Constitution. HippoPress' contention, in the alternative, that Part I, Article 22 of the New Hampshire Constitution does not require state action is without merit. *See In re Certain Scholarship Funds*, 133 N.H. at 230 (requiring state action "to implicate the provisions of our constitution"); *Opinion of the Justices*, 128 N.H. 46, 50 (1986) (requiring state action under Part I, Article 22 of the New Hampshire Constitution).

Accordingly, we reverse that part of the trial court's order ruling that SMG violated both Part I, Article 22 of the New Hampshire Constitution and the First Amendment of the United States Constitution. We affirm that part of the trial court's order ruling that state action did not exist for purposes of 42 U.S.C. § 1983.

Even if we assume that there was state action, we reach the same result. We conclude that the arena is a nonpublic forum and that the contract between SMG and Union Leader is a reasonable restriction of speech.

To determine whether the contract violated Part I, Article 22 of the New Hampshire Constitution, two questions must be answered: (1) What type of forum is the arena; and (2) Can the challenged restriction survive the constitutional scrutiny appropriate to the regulation of expression in that type of forum. *See Multimedia Pub. v. Greenville-Spartanburg Airport*, 991 F.2d 154, 158 (4th Cir. 1993); *Cornelius v. NAACP Legal Defense & Ed. Fund*, 473 U.S. 788, 797 (1985).

■■ The United States Supreme Court has identified three distinct fora in which speech may be communicated: (1) government property that has traditionally been available for public expression (traditional public forum); (2) government property that has been opened for expressive activity by part or all of the public (designated public forum); and (3) all remaining government property (nonpublic forum). *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45-46 (1983); *State v. Hodgkiss*, 132 N.H. 376, 382-83 (1989). Restrictions on speech in traditional and designated public fora are subject to the highest scrutiny and survive only if they are narrowly drawn to achieve a compelling state interest. *Perry*, 460 U.S. at 45-46. Restrictions on speech in nonpublic fora are subject to a far more limited review and are constitutional if they are reasonable and

not an effort to suppress expression based on the speaker's viewpoint. *Id.* at 46.

■ ■ The trial court erred when it found that the contract between SMG and Union Leader transformed the arena from a nonpublic forum into a designated public forum. Not every instrumentality used for communication is a traditional or designated public forum. *Cornelius*, 473 U.S. at 803. A traditional or designated public forum has as its principal purpose the free exchange of ideas. *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Perry*, 460 U.S. at 46 (quotation omitted). "[C]onsistent with the notion that the government—like other property owners—has power to preserve the property under its control for the use to which it is lawfully dedicated the government does not create a public forum by inaction. . . . The decision to create a public forum must . . . be made by intentionally opening a nontraditional forum for public discourse." *International Soc.*, 505 U.S. at 679-80 (quotations and citations omitted).

SMG did not open the arena for public discourse by contracting with Union Leader for the exclusive newspaper distribution rights in the arena. SMG manages the arena for the City to provide the downtown area with economic stimulus. SMG enters into contracts with private parties that want to reach a particular audience. SMG provides a medium for musicians, sports teams and other entertainers to showcase their talents, as well as for advertisers that want to reach a target audience. These private parties, however, need to pay for the right to reach their audiences. SMG and the City are engaged in commerce. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974). SMG enters into profit-conscious contracts in the commercial marketplace. *Post Newsweek, Etc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 85 (D. Conn. 1981). Neither SMG nor the City has opened the doors of the arena to all parties wishing to disseminate their products. Nor is the arena open to the public for the free exchange of ideas. *Cornelius*, 473 U.S. at 800. To the contrary, entry is guarded, and only those parties able to pay for access, such as musicians, sports teams, spectators or newspapers, are allowed in.

This is not a case where the City has opened the arena for public events, such as inaugurations or graduations, and attempted to exclude a particular speaker or point of view. In that case, not only would state action be readily apparent, but the forum analysis might shift as well. We are not faced with such a situation under the facts of this case. HippoPress

does not contend that the City has opened the arena as a place for general public discourse. In fact, the City hired SMG to do just the opposite. SMG was hired to enter into private contracts in the commercial marketplace to bring economic vitality to the downtown area.

Even in a nonpublic forum, however, the City is still constrained by the State Constitution and can only "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. The reasonableness of the government's regulation on speech in a nonpublic forum must be assessed in light of the purpose of the forum and all the surrounding circumstances, *Cornelius*, 473 U.S. at 809, including the alternative channels that remain open for the communication to take place, *Perry*, 460 U.S. at 53. The regulation "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. Moreover, "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." *International Soc.*, 505 U.S. at 678; *see Lehman*, 418 U.S. at 303-04 (finding restriction on speech permissible if not arbitrary, capricious, or invidious when city was partaking of commercial venture in proprietary capacity); *Post Newsweek*, 510 F. Supp. at 85-86 (same). In this case, it is undisputed that HippoPress was not excluded from the arena due to its viewpoint. The only remaining question then is whether the contract between SMG and Union Leader was reasonable.

In *Perry*, the Court stated that "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property." *Perry*, 460 U.S. at 49. The contract between SMG and Union Leader is reasonable because it is wholly consistent with SMG's interest in operating a financially viable commercial arena. Without the ability to enter into exclusive contracts for advertising and distributing products, SMG would be severely hampered in its ability to compete in the marketplace. *See Post Newsweek*, 510 F. Supp. at 85-86.

The record reflects that substantial alternative channels of distribution remain open to HippoPress, which supports the reasonableness of the

contract between SMG and Union Leader. *See Perry,* 460 U.S. at 53. HippoPress has the ability to place newspaper distribution racks outside all entrances to the arena and is permitted to hand out newspapers to people entering or leaving the arena before or after events. On one occasion, HippoPress handed out nearly one thousand papers in twenty minutes, an "astounding" number, according to HippoPress' circulation manager. HippoPress is also free to enter into newspaper distribution contracts with any of the tenants or licensees of the arena. For example, under the terms of the agreement between the Manchester Monarchs, the arena's principal tenant, and SMG, the Monarchs have reserved the right to enter into advertising agreements, including newspaper distribution contracts, with other parties, including HippoPress.

The Federal Constitution affords HippoPress no greater protection than does the State Constitution under these circumstances. *See Perry,* 460 U.S. at 45-46; *Hodgkiss,* 132 N.H. at 382-83. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

*Reversed in part; affirmed in part.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.