**Stacey PERKINS, p.p.a. Terri Perkins, Plaintiff, Appellant,**

v.

**LONDONDERRY BASKETBALL CLUB, Defendant, Appellee.**

No. 99–1385.

United States Court of Appeals, First Circuit.

Heard Sept. 15, 1999.

Decided Nov. 8, 1999.

**16**

Linda S. Johnson, with whom Rachel A. Hampe, Ann Marie Dirsa, and McLane, Graf, Raulerson & Middleton, P.A. were on brief, for appellant.

Joseph L. Hamilton, with whom Hamilton Law Offices was on brief, for appellee.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

Plaintiff-appellant Stacey Perkins, suing by and through her mother and next friend, Terri Perkins, alleges that defendant-appellee Londonderry Basketball Club (LBC) violated the Fourteenth Amendment when it refused to allow her to play in a youth basketball tournament because of her gender. The United States District Court for the District of New Hampshire, discerning no state action, resolved the constitutional claim adversely to the appellant (albeit without reaching the merits) and declined to exercise supplemental jurisdiction over the appellant's pendent state-law claims. We affirm.

## I. BACKGROUND

We marshal the facts in the light most hospitable to the appellant's theory of the case, drawing all reasonable inferences in her favor. *See Coyne v. Taber Partners I*, 53 F.3d 454, 456 (1st Cir.1995).

Stacey Perkins is a ten-year-old female with an affinity for the sport of basketball. She resides in Seabrook, New Hampshire, a community which has no competitive "all-girls" basketball league for Stacey's age group. At the start of the 1997–1998 season, Stacey seized the only realistic op-portunity for a girl of her age to compete and joined the "Red Devils," a mixed-gender team that plays in the Seabrook Recreational League (SRL). In March 1998, Stacey was one of two girls selected to play on the SRL's twelve-member All–Star team.

The scene now shifts from Seabrook to Londonderry, New Hampshire (the Town), where basketball has proven to be a popular pastime. In the 1980s, Arthur Psaledas, the Town's Recreation Director, ran a youth basketball program on his own time. As demand increased, however, Psaledas could not keep pace, and several community groups banded together in 1990 to form LBC (a voluntary, nonprofit organization that enjoys tax-exempt status under 26 U.S.C. § 501(c)(3)). In furtherance of its mission to provide basketball opportunities for the Town's young people, LBC manages single-sex boys' and girls' teams for third through eighth-graders. To cap the season, it sponsors a one-week annual tournament (really two tournaments, because LBC splits it into separate brackets for boys and girls).

LBC solicits donations to support its activities. The annual tournament constitutes its most substantial fundraising event: registration fees, ticket sales, and souvenir sales (e.g., T-shirts) all generate revenues. LBC and the Town's Recreation Commission have a modest interlock—two members of LBC's five-member board of directors happen to serve as members of the Recreation Commission—and Commission members often assist as volunteers at the tournament by keeping score, running the clock, and the like.

LBC uses the Town's public school gymnasia for league and tournament play. Gym time is allocated by Psaledas, who holds a yearly meeting for that purpose with user representatives and Town officials. Like other groups that use the Town's facilities, LBC pays a mandatory security fee to a private service but pays no rent.

Beginning in 1996, the Town adopted sanctioning requirements in an effort to prioritize requests for extra-curricular use of school gyms. We reprint the sanctioning requirements in an appendix. Uncontroverted evidence makes clear that the Town's goal in adopting these requirements was to bring competing groups together and thus lessen the burden on municipal facilities. LBC sought and gained the Town's imprimatur under the sanctioning requirements.

As part of an allocation process, each group that aspires to gym use is required to submit a request for dates to the Town's School District. Because Psaledas has been handling these submissions for many years, he knows the needs of the basketball, soccer, volleyball, and other leagues and automatically furnishes information to the School District on behalf of LBC and other similarly situated private groups. Although non-sanctioned groups may use the gyms, sanctioned groups receive priority. Moreover, Psaledas occasionally has moved adult groups to different time slots to accommodate LBC's tournament-related needs.

There are other points of contact between LBC and the Town: LBC holds meetings in school buildings, distributes flyers regarding tryout schedules through the schools, and relies on Psaledas to inform it when the School District cancels its programs. The most salient contact point is financial: LBC from time to time contributes money to the Town's schools for scholarships, travel, uniforms, basketball equipment, court maintenance, and the like. Between 1991 and 1998, these donations amounted to $22,000. In the event LBC were to dissolve, its charter provides that all its assets would be distributed to the Town.

## II. THE DENOUEMENT

The SRL arranged for its All–Star team to play in LBC's tenth annual "boys'" tournament. The schedule called for the team to play its first game on March 24, 1998. But LBC opted to apply its policy of "separate and equal" brackets, which contained no provision for mixed-gender play, even where, as in this case, a child's community offered no single-sex team on which she could compete. In accordance with the policy (which LBC defends as an attempt to maximize the participation of both sexes), LBC informed Stacey's coach that girls would not be allowed to participate in its boys' tournament.

Three days later, Stacey sued LBC. She alleged equal protection violations under the Fourteenth Amendment and 42 U.S.C. § 1983 as well as a number of claims under state law. Her complaint sought variegated relief, including an order enjoining LBC from denying her the opportunity to play in the tournament and an award of money damages. Any prospect of a temporary restraining order evaporated when the SRL All–Star team withdrew from the tournament. Stacey's suit nevertheless proceeded, principally on her claim for damages.

Following a plenitude of pretrial discovery, LBC moved for summary judgment. In a meticulously reasoned unpublished opinion, the district court granted the motion as to the Fourteenth Amendment and section 1983 claims, holding that LBC's conduct did not constitute state action.[1] The court simultaneously dismissed the supplemental state-law claims without prejudice. *See* 28 U.S.C. § 1367(c). This appeal, in which we review the lower court's grant of summary judgment de novo, *see Coyne*, 53 F.3d at 457, followed.

---

1. As a practical matter, the Fourteenth Amendment's "state action" requirement is coextensive with section 1983's "under color of state law" requirement. *See Yeo v. Town of Lexington*, 131 F.3d 241, 248 n. 3 (1st Cir.

1997), *cert. denied,* 524 U.S. 904, 118 S.Ct. 2060, 141 L.Ed.2d 138 (1998); *Barrios–Velazquez v. Asociacion De Empleados,* 84 F.3d 487, 491 (1st Cir.1996). Hence, we do not engage in a separate section 1983 analysis.

# 18

## III. ANALYSIS

■ Despite criticism from the academy,[2] the public/private dichotomy remains embedded in our constitutional jurisprudence. *See National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). This dichotomy distinguishes between state action, which must conform to the prescriptions of the Fourteenth Amendment, and private conduct, which generally enjoys immunity from Fourteenth Amendment strictures.[3] *See id.; Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The line of demarcation between public and private action, though easily proclaimed, has proven elusive in application. And the Justices, mindful of the fact-sensitive nature of the inquiry, have staunchly eschewed any attempt to construct a universally applicable litmus test to distinguish state action from private conduct. Instead, they have directed lower courts to take a case-by-case approach, "sifting facts and weighing circumstances [so that] the nonobvious involvement of the State in private conduct [can] be attributed its true significance." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

■■ There is no direct "state action" here: the parties, who agree on little else, concur that LBC is not structurally an arm of municipal government. In cases that involve indirect state action, courts conventionally have traveled a trio of analytic avenues, deeming a private entity to have become a state actor if (1) it assumes a traditional public function when it undertakes to perform the challenged conduct, *or* (2) an elaborate financial or regulatory nexus ties the challenged conduct to the State, *or* (3) a symbiotic relationship exists between the private entity and the State. *See Barrios–Velazquez v. Asociacion De Empleados*, 84 F.3d 487, 493 (1st Cir. 1996); *Rodriguez–Garcia v. Davila*, 904 F.2d 90, 96 (1st Cir.1990). A common thread binds these pathways. Each of them, from a slightly different coign of vantage, aims at the same destination: whether "private actors [have] aligned themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp" of the Fourteenth Amendment. *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253–54 (1st Cir.1996). The appellant hypothesizes that each and all of these avenues lead to the conclusion that LBC's conduct meets the requirements of the state action doctrine. We explore the validity of that hypothesis.

### A. *Traditional Public Function.*

■ Pointing out that LBC took over the task of operating the youth basketball program from the Town's Recreation Director, the appellant contends that LBC assumed a traditional public function. On the facts, this contention lacks force. The record establishes beyond peradventure that Psaledas never ran a youth basketball program in his capacity as Recreation Director. Indeed, private sponsorship of youth basketball existed in Londonderry well before LBC's formation.

■ More importantly, however, the appellant's construct misconstrues the law. The public function analysis is designed to flush out a State's attempt to evade its

**2.** *See, e.g.,* Susan Bandes, *The Negative Constitution: A Critique*, 88 Mich. L.Rev. 2271, 2285–97 (1990); Laurence H. Tribe, *The Curvature of Constitutional Space: What Lawyers Can Learn from Modern Physics*, 103 Harv. L.Rev. 1, 9–10, 12 n.54, 28 (1989); Cass R. Sunstein, *Lochner's Legacy*, 87 Colum. L.Rev. 873, 886–88 (1987); Erwin Chemerinsky, *Rethinking State Action*, 80 Nw. U.L.Rev. 503 (1985).

**3.** "State action," of course, includes action not only by states, but also by their political subdivisions (e.g., cities and towns). *See Avery v. Midland County*, 390 U.S. 474, 479–80, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); *Mendez v. Belton*, 739 F.2d 15, 18 n. 1 (1st Cir.1984). Thus, though it may seem anomalous to discuss the Town's involvement in terms of "state action," we follow that well-worn path.

responsibilities by delegating them to private entities. *See Barrios–Velazquez,* 84 F.3d at 494. In order to prevail on such a theory, a plaintiff must show more than the mere performance of a public function by a private entity; she must show that the function is one *exclusively* reserved to the State. *See id.* at 493–94. Government customarily involves itself in many types of activities, but few of those activities come within the State's exclusive preserve. To date, the short list of activities that have been held to satisfy this demanding criterion includes "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal park." *United Auto Workers v. Gaston Festivals, Inc.,* 43 F.3d 902, 907 (4th Cir. 1995) (citations omitted). When a plaintiff ventures outside such narrow confines, she has an uphill climb.

■ The appellant cannot scale these heights. The case law makes pellucid that the administration of an amateur sports program lacks the element of exclusivity and therefore is not a traditional public function. *See Tarkanian,* 488 U.S. at 197 n. 18, 109 S.Ct. 454 (discussing the NCAA's overriding function of fostering amateur athletics at the college level, and noting that "while we have described that function as 'critical,' by no means is it a traditional, let alone an exclusive state function" (citation omitted)); *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 545, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) ("Neither the conduct nor the coordination of amateur sports has been a traditional governmental function."); *Behagen v. Amateur Basketball Ass'n,* 884 F.2d 524, 531 (10th Cir.1989); *McCormack v. National Collegiate Athletic Ass'n,* 845 F.2d 1338, 1346 (5th Cir.1988); *Ponce v. Basketball Fed'n,* 760 F.2d 375, 381 (1st Cir.1985).

The fact that LBC's basketball program targets children rather than adults provides no succor to the appellant. In *Ren-*

*dell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court held that the education of maladjusted high-school students was not an exclusive function of the State and therefore was not an inherently governmental function. If youngsters' education does not qualify under the Court's test, the coordination of a youth basketball league *a fortiori* falls outside the range of such functions. *Accord Magill v. Avonworth Baseball Conf.,* 516 F.2d 1328, 1332 (3d Cir.1975) (holding that the operation of a youth baseball league did not constitute private performance of a governmental function); *cf. Fortin v. Darlington Little League, Inc.,* 514 F.2d 344, 347 (1st Cir. 1975) (finding state action but declining to hold that the Little League had assumed a governmental function). We therefore reject the appellant's attempt to ground state action in LBC's performance of a function that we conclude is not exclusively governmental.

#### B. *Nexus.*

■ In order to prevail under the second test for state action, a plaintiff must show a "close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson,* 419 U.S. at 351, 95 S.Ct. 449. Such a nexus requires more than the State's passive acquiescence in, or mere approval of, the challenged conduct. *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 986, 143 L.Ed.2d 130 (1999). Rather, the plaintiff must show that the State "has exercised coercive power or has provided such significant encouragement, either overt or covert," that the challenged conduct fairly can be attributed to the State. *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

■ This inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel. Thus, the focal point is the connection between the State and

the challenged conduct, not the broader relationship between the State and the private entity. *See id.* Extensive regulation, without more, cannot establish the necessary nexus. *See United States Olympic Comm.,* 483 U.S. at 544, 107 S.Ct. 2971; *Blum,* 457 U.S. at 1004, 102 S.Ct. 2777. Indeed, even when the State has conferred monopoly status on a private entity, courts will not find state action on a nexus theory absent a snug relationship between the grant of monopoly power and the challenged conduct itself. *See Jackson,* 419 U.S. at 351–52, 95 S.Ct. 449.

■ We need not tarry. For the purpose of nexus analysis, the appellant's claim that the Town, as a general matter, exercises a modicum of control over LBC by reason of the sanctioning requirements and the reserved power to regulate the use of school gymnasia misses the mark. So, too, her related claim that the Town's provision of generic benefits (such as the rent-free use of facilities) constitutes significant encouragement. Both claims overlook the hub—the centrality of the challenged conduct to a properly performed nexus analysis—for the spokes.

In point of fact, the appellant can prevail in this instance only by demonstrating that the Town exercised coercive power over, or significantly encouraged, LBC's promulgation of the same-sex tournament rule or its decision to ban the appellant from tourney participation. We have combed the record and have found absolutely no evidence that the Town acted in such a fashion.[4] Hence, the nexus claim fails.

**4.** Even if Psaledas, as the appellant asserts, could have asked the Recreation Commission to "de-sanction" LBC and recommend that it no longer be allowed to use public facilities, his failure to do so would have constituted no more than a failure to interfere with LBC's same-sex tournament rule and LBC's application of that rule in this instance. As noted, mere acquiescence is insufficient to forge the requisite nexus. *See Sullivan,* 119 S.Ct. at 986.

**5.** Our cases indicate a lack of consensus on this last point. *Compare Yeo v. Town of Lex-*

## C. *Symbiosis.*

The appellant masses her heaviest artillery behind the claim that LBC and the Town enjoyed a symbiotic relationship, sufficient to establish state action. In an evolving area of the law, this claim's provenance is open to question.

### 1.

Almost four decades ago, the Supreme Court held that a symbiotic relationship between a State and a private entity justified a finding of state action. *See Burton,* 365 U.S. at 725, 81 S.Ct. 856. In several later cases, however, the Court has either distinguished or ignored *Burton*'s broadest language. *See, e.g., Sullivan,* 119 S.Ct. at 988–89; *United States Olympic Comm.,* 483 U.S. at 547, 107 S.Ct. 2971; *Blum,* 457 U.S. at 1011, 102 S.Ct. 2777. Still, the Court has never expressly overruled *Burton,* and none of the later cases have involved equal protection claims based on race or gender discrimination. *Cf. Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 69 (2d Cir.1976) (suggesting that state action requirements may be less demanding for such claims); *Weise v. Syracuse Univ.,* 522 F.2d 397, 405–07 (2d Cir.1975) (similar).

In all events, we need not determine today either the extent to which *Burton* remains good law or whether the parameters of what constitutes state action may change depending on the nature of the right at issue.[5] Even if we treat *Burton*'s

*ington,* 131 F.3d 241, 254 & n. 15 (1st Cir. 1997) (suggesting that the state action inquiry may be flexible in this regard), *cert. denied,* 524 U.S. 904, 118 S.Ct. 2060, 141 L.Ed.2d 138 (1998), *with D'Amario v. Providence Civic Ctr. Auth.,* 783 F.2d 1, 4 (1st Cir.1986) ("We stress that the issue of state action is separate from the constitutional issue lying at the heart of a § 1983 action. [Intuitions] about the outcome of the constitutional issue must not affect consideration of the very different issue of state action.").

classic symbiotic relationship test as fully intact, the appellant cannot prevail.

 In terms, this test requires an evaluation of whether the government "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Burton,* 365 U.S. at 725, 81 S.Ct. 856. A true symbiosis is predicated on interdependence and joint participation. Thus, in contrast to the nexus inquiry, this avenue of approach ousts the challenged conduct from center stage and concentrates instead on the nature of the overall relationship between the State and the private entity. *See id.; Rodriguez–Garcia,* 904 F.2d at 96–97.

Despite this focus on the totality of the circumstances, the case law suggests some factors to which courts typically attach special weight. The most salient of these is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs. *See Evans v. Newton,* 382 U.S. 296, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Barrios–Velazquez,* 84 F.3d at 494–95; *United Auto Workers,* 43 F.3d at 908. Relatedly, the circumstances surrounding a private entity's use of public facilities warrant careful attention. In this regard, courts long have recognized that a municipality's mere provision of recreational fora (such as athletic facilities) does not give rise to state action. *See Gilmore v. City of Montgomery,* 417 U.S. 556, 574, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); *Sherman v. Community Consol. Sch. Dist. 21,* 8 F.3d 1160, 1167–68 (7th Cir.1993); *Magill,* 516 F.2d at 1333, 1335; *Fortin,* 514 F.2d at 347. If, however, a municipality "rations otherwise freely accessible recreational facilities, the case for state action will naturally be stronger than if the facilities are simply available to all comers without condition or reservation." *Gilmore,* 417 U.S. at 574, 94 S.Ct. 2416.

Subject to certain caveats, another factor that courts take into account in evaluating the nature of the relationship be-

tween the State and a private entity is whether (and if so, to what extent) the former knowingly shared in the profits spawned by the latter's discriminatory conduct. *See Barrios–Velazquez,* 84 F.3d at 494. The caveats are these. First, this factor implicates only profits arising from the challenged conduct, rather than from the relationship as a whole. *See id.; Ponce,* 760 F.2d at 382. Second, for profit-sharing to be relevant, the challenged conduct must be indispensable to the financial success of the joint project. *See Burton,* 365 U.S. at 723–24, 81 S.Ct. 856; *Ponce,* 760 F.2d at 381–82. This tracks nicely with the use/rationing distinction, because government is more likely to ration its facilities to favor a private entity when the private entity's profits are indispensable to the government's anticipated return from the project.

### 2.

 Here, the appellant posits that the Town's sanctioning requirements and control over scheduling constitute impermissible rationing and, thus, joint participation. The district court disagreed, and so do we.

As the appellant constructs it, this argument emphasizes Sanctioning Requirement No. 3 (which stipulates that, as a condition to sanctioned status, an organization must represent that there is "no other sanctioned program in existence that offers the same or similar program"). In her view, this requirement ensures monopoly status and excludes competing groups from the use of Town facilities. The record, however, belies this conclusion.

In the first place, the *nisi prius* roll is bereft of any evidence that other youth basketball programs have been deterred from attempting to secure sanctioning or to obtain gym time. Absent such a showing, the most that can be said is that LBC took advantage of an opportunity that the Town made available to all organizations of its type. Conduct that involves no more than seizing a widely available opportunity

offered by the State will not justify a finding of impermissible rationing. *See Sherman*, 8 F.3d at 1167; *Magill*, 516 F.2d at 1335.

In the second place, the record reflects that both sanctioned and non-sanctioned groups actually use the gyms. Although sanctioned groups theoretically receive priority in scheduling, this fact alone, without proof of adverse effects, does not amount to the type of rationing that constitutes state action. *See Magill*, 516 F.2d at 1335 (explaining that facility-use decisions, in and of themselves, did not "significantly involve[ ] the state in [the athletic conference's] gender policy").

Going beyond the sanctioning requirements, the appellant maintains that *Fortin* controls our resolution of her claim. In that case, we held that a Little League's "heavy and preferred dependency upon city facilities" justified a finding of joint participation. 514 F.2d at 347. But *Fortin* involved a much different scenario. There, the city laid out and maintained recreational facilities (baseball diamonds and their accouterments) primarily for the benefit of the Little League. *See id.* During the baseball season, the Little League preempted the facilities five nights per week and on Saturdays, vastly restricting other groups' access to them, to the point that other users often were precluded from all practical access. *See id.* In contrast, the Town's gyms are used primarily for school purposes and, after hours, are frequented by an array of other groups (e.g., volleyball teams, men's basketball teams), including but not limited to LBC. Thus, *Fortin* does not advance the appellant's cause. Her rationing argument therefore fails.

The appellant next proposes that a symbiotic relationship exists because the Town knowingly shares in profits generated by the challenged conduct (i.e., the same-sex tournament rule). In advancing this pro-

posal, the appellant seizes upon testimony that links LBC's same-sex rule to its desire to maximize participation in its tournament. Building on this foundation, the appellant asserts that, by maximizing participation, the rule simultaneously maximizes LBC's profits and therefore maximizes the Town's profits. Passing the fact that the appellant unveils this assertion for the first time on appeal (and it is, therefore, procedurally defaulted, *see Campos–Orrego v. Rivera*, 175 F.3d 89, 95 (1st Cir.1999)), the piling of inference upon inference does not prove the appellant's point. We explain briefly.

Even if maximization of participation can by some alchemy be converted, without proof, into maximization of LBC's profits, the record contains nothing which indicates that the Town knowingly shared in any incremental revenues that were so generated. The mere fact that, over the years, LBC donated some $22,000 to the Town—a relatively small percentage of the total funds that it raised [6]—does not suffice to bind the Town's gain to the same-sex tournament rule. *See Barrios–Velazquez*, 84 F.3d at 494. Nor does the record permit a finding that the rule was indispensable to the Town's success vis-à-vis the venture. Assuming, *arguendo*, that repealing the rule would shrink LBC's revenues, there is no basis for a finding that LBC's donations to the Town also would shrink, let alone that they would diminish so drastically as to undermine the Town's approval of LBC's use of public school gymnasia. From aught that appears, LBC's largesse has not been based on a percentage of funds raised at the tournament or on any other formula pegged to tournament revenues. And without factual support for the conclusory claim that the same-sex tournament rule (which the Town had no hand in propounding) is indispensable to the Town's success anent the venture, the profit-sharing rationale

---

**6.** The record reflects that between October 1, 1991, and September 30, 1997, LBC had revenues in excess of $155,000.

will not wash. *See Burton*, 365 U.S. at 723–24, 81 S.Ct. 856.

Finally, the appellant labors to demonstrate that LBC is not independent in the conduct of its everyday affairs. She does not succeed. Sanctioning by the Town does not evince an insinuation of the Town into LBC's ordinary course of day-to-day business; instead, sanctioning represents the Town's attempt to administer its own resources for the benefit of its residents. In all events, LBC's purview is not confined to the one-week life span of tournament play. Rather, it administers and coordinates teams of youngsters throughout a lengthy season and performs all the preseason preparation that such an undertaking invariably entails. The Town simply is not involved to any meaningful degree in those myriad activities. Moreover, what the appellant perceives as an interlock between LBC and the Recreation Commission does not alter this decisional calculus. While two LBC directors serve as members of the Recreation Commission, and Commission members assist at the annual one-week tournament by performing menial tasks, such discrete incidents of assistance do not constitute municipal involvement in the daily management of LBC's affairs. *See Evans*, 382 U.S. at 301, 86 S.Ct. 486; *United Auto Workers*, 43 F.3d at 908.

The short of it is that we find in this case the coordination of efforts that often characterizes the operation of private youth groups at public schools, but no "significantly probative" evidence, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that the Town and the private entity have become so joined at the hip that a symbiotic relationship persists. To the precise contrary, the facts, though we have viewed them in the light most congenial to the appellant, do not warrant a finding of joint participation to the degree needed to sustain a claim of state action.

## IV. CONCLUSION

As we have considered all of the appellant's remaining arguments and found them unconvincing, we need go no further. In closing, however, let us be perfectly clear. We regard what has occurred as extremely lamentable—after all, we have not been provided with any cogent justification for LBC's same-sex tournament rule, which effectively deprived Stacey Perkins of an opportunity to play in the youth basketball tournament. But the regulation of private entities like LBC normally is accomplished through statutes, not through the Constitution. And although Stacey's constitutional claim fails for want of state action, she has asserted state-law claims which may be litigated anew in the New Hampshire courts. *See* 28 U.S.C. § 1367(c).

*Affirmed.*

### APPENDIX

The Town's sanctioning requirements for use of the school gyms, quoted verbatim and in full, provide that:

1. 60% of the participants are residents of Londonderry

2. The coaches/supervisors are residents of Londonderry

3. There be no other sanctioned program in existence that offers the same or similar program

4. That the program be a permanent one, and not simply a one season or one year program

5. That there be a demonstration that the program has been well planned and will be properly supervised

6. That the group requesting sanctioning demonstrate that they have the proper frame work [sic] for leadership, and the people who will provide this leadership

7. That the group has no outstanding financial obligations that would hinder the group's progress

8. All sanctioned groups must comply will [sic] all the rules set forth by the School District and Recreation Commission regarding usage of facilities. Failure to comply with the rules can result in the withdrawal of the Commission's sanction of the group.