

## Fourth Court of Appeals
### San Antonio, Texas

### OPINION

No. 04-17-00774-CV

Judy **MILLSPAUGH**,
Appellant

v.

**BULVERDE SPRING BRANCH EMERGENCY SERVICES**,
Appellee

From the 407th Judicial District Court, Bexar County, Texas
Trial Court No. 2016-CI-21767
Honorable Karen H. Pozza, Judge Presiding

Opinion by:   Karen Angelini, Justice

Sitting:      Sandee Bryan Marion, Chief Justice
              Karen Angelini, Justice
              Irene Rios, Justice

Delivered and Filed:  July 18, 2018

REVERSED AND REMANDED

Judy Millspaugh appeals from the trial court's judgment granting a plea to the jurisdiction

and dismissing her Title 42 U.S.C. section 1983 claim against Bulverde Spring Branch Emergency

Services ("BSB Emergency Services"). We conclude the trial court erred in dismissing the section

1983 claim because the record shows that fact issues exist with regard to state action. Therefore,

we reverse and remand.

BACKGROUND

Millspaugh sued her former employer, BSB Emergency Services, alleging she was wrongfully terminated from her position as director of development. BSB Emergency Services is a private, non-profit organization that provides ambulance and fire protection services to three Emergency Service Districts ("the Districts") in Comal County, Texas. The Districts are political subdivisions of the state.

According to Millspaugh's petition, BSB Emergency Services terminated her employment because she had written and distributed a letter insinuating that an individual who was both a BSB Emergency Services board member and an Emergency Services District commissioner was underpaying his property taxes. Millspaugh's petition included a claim for violations of her constitutional right to free speech under Title 42 U.S.C. section 1983 and a claim under the Texas Whistleblower Act.

In answer to Millspaugh's suit, BSB Emergency Services filed a plea to the jurisdiction, arguing the trial court lacked subject-matter jurisdiction over Millspaugh's claims because (1) Millspaugh was not a public employee; (2) BSB Emergency Services was a private, non-profit organization that merely contracted with governmental entities to provide services; and (3) Millspaugh was not employed by an entity that was required to comply with the free speech provisions of the Texas and United States constitutions. In response, Millspaugh argued that the plea to the jurisdiction should be denied because even though BSB Emergency Services was a private entity, it was still subject to liability under section 1983 because it had acted under "color of state law" or governmental authority in terminating Millspaugh.

The trial court held a hearing on the plea to the jurisdiction. At the hearing, the undisputed evidence showed that BSB Emergency Services had contracted with three Emergency Service Districts—District 1, District 4, and District 5—in Comal County to provide ambulance and fire

protection services to the Districts. Each of the Districts, which are governmental entities, is governed by a board of commissioners and has the power to levy taxes within the county. Additionally, the undisputed evidence showed that shortly before she was terminated Millspaugh had written and distributed a letter insinuating that a member of both the board of directors of BSB Emergency Services and District 4's board of commissioners was "cheating the taxpayers" by underpaying his property taxes. The trial court granted the plea to the jurisdiction and dismissed Millspaugh's claims with prejudice. Millspaugh appealed.

On appeal, Millspaugh challenges only the dismissal of her section 1983 claim.

### TITLE 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and the laws of the United States when that deprivation takes place "under color of any statute, ordinance, regulation, custom, or usage of any State . . . ."[1] 42 U.S.C. § 1983; *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). To prevail on a section 1983 claim, the plaintiff must prove that she was deprived a right secured by the Constitution or the laws of the United States by a person acting under color of law. *Paz v. Weir*, 137 F. Supp. 2d 782, 796 (S.D. Tex. 2001). "The ultimate issue in a § 1983 case is whether the alleged infringement of federal rights stemmed from conduct fairly attributable to the state." *Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir. 1993). Therefore, a private entity may be liable for conduct taken under the color of law within the meaning of section 1983. *See id*. However, there is no section 1983 claim when the

---

[1]Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

alleged infringement did not stem from conduct fairly attributable to the state. "[M]ere private conduct, no matter how discriminatory or wrongful, is excluded from § 1983's reach." *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (internal quotations omitted). "Where there is no state action, no section 1983 constitutional claim exists." *Yeager*, 980 F.2d at 338.

Courts apply several different tests to determine if a private actor's conduct occurs under the color of governmental authority. *Lugar*, 457 U.S. at 939; *Cornish*, 402 F.3d at 549. These tests include: (1) the nexus test, (2) the joint action test, (3) the state compulsion test, and (4) the exclusive public function test. *Lugar*, 457 U.S. at 939; *Cornish*, 402 F.3d at 549-50. Under the nexus test, courts consider whether the state has inserted itself into a position of interdependence with the private actor such that it was a joint participant in the enterprise. *Cornish*, 402 F.3d at 550. Under the joint action test, private actors are considered state actors where they are willful participants in joint action with the state or its agents. *Id*. Under the state compulsion test, a private actor's conduct is attributable to the state when it exerts coercive power over the private entity or provides significant encouragement. *Id*. Finally, under the exclusive public function test, courts examine whether the private entity performs a function that is exclusively reserved for the state. *Id*. at 549.

The U.S. Supreme Court has not determined whether these tests are actually different in operation or simply different ways of characterizing this necessarily fact-bound inquiry. *Lugar*, 457 U.S. at 939; *Cornish*, 402 F.3d at 550. Courts take a case-by-case approach in evaluating state action. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the [s]tate in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961).

For example, in *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, a doctor brought a section 1983 claim against a private hospital after his medical staff privileges were terminated. 807 F.2d 1214,

1217 (5th Cir. 1987). The doctor claimed the hospital had discriminated against him based on his national origin and alienage. *Id*. The trial court concluded there was no state action, but the Fifth Circuit reversed. *Id*. at 1220-22. In reaching this conclusion, the Fifth Circuit emphasized that the hospital was built by the hospital authority, which was a public corporation created by statute to serve a public purpose. *Id*. at 1221. The facilities were publicly owned and were entirely constructed with public funds. *Id*. The hospital authority had entered into an agreement with a private hospital to provide additional funding and to assume the operation of the hospital; however, the hospital authority continued to finance the hospital through bonds, mortgages, and fundraising. *Id*. The Fifth Circuit noted that even though the governmental entity, the hospital authority, had no input on day-to-day operations of the private hospital, it was informed of the private entity's decisions, including the decision to terminate the doctor's privileges. *Id*. The Fifth Circuit explained: "The private defendants cannot receive public funds, utilize public facilities, and serve a public purpose, yet insist that their private status forestalls any correction of a violation of the constitutional rights of their medical staff." *Id*.

By contrast, in *Cornish*, the Fifth Circuit held the plaintiff could not establish the required state action to support his section 1983 claim, and therefore, the claim was properly dismissed by the trial court. 402 F.3d at 551. There, a correctional officer brought a section 1983 claim against his former employer, a private correctional facility, alleging he was wrongfully terminated after he reported violations in operating the facility. *Id*. at 548. Although it was a private corporation, the facility was subject to considerable regulation by the state. *Id*. at 550. Additionally, all the correctional officers employed by the facility were required to obtain the same certifications as the guards working for the state. *Id*. Nevertheless, the Fifth Circuit concluded that the plaintiff failed to establish the necessary state action by virtue of the nexus, exclusive public function, state compulsion, or joint action tests. *Id*. at 550-51. In making this determination, the Fifth Circuit

noted the absence of any factual allegations that the state had any role in the decision to terminate the plaintiff. *Id*. "The issue . . . is whether [the private correctional facility] acted under color of state law in terminating Cornish's employment, *not* whether its providing juvenile correctional services was state action." *Id*. at 550. (Emphasis in original).

## PLEA TO THE JURISDICTION

Whether the trial court has subject-matter jurisdiction over a particular claim is a question of law that can be challenged in a plea to the jurisdiction. *Suarez v. City of Texas City*, 465 S.W.3d 623, 632 (Tex. 2015); *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We review the trial court's ruling on a plea to the jurisdiction de novo. *Suarez*, 465 S.W.3d at 632; *Miranda*, 133 S.W.3d at 226.

"[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). "[I]n a case in which the jurisdictional challenge implicates the merits of the plaintiffs' cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists." *Miranda*, 133 S.W.3d at 227. A jurisdictional issue implicates the merits of a case when the determination of many, if not most, of the challenged jurisdictional facts will also determine whether the plaintiff is entitled to relief on the merits. *Univ. of Texas v. Poindexter*, 306 S.W.3d 798, 807 (Tex. App.—Austin 2009, no pet.).

When we review the trial court's ruling on a plea to the jurisdiction in which disputed evidence implicates both the trial court's subject-matter jurisdiction and the merits of the case, we consider relevant evidence to determine if a fact issue exists. *Suarez*, 465 S.W.3d at 632-33. We take as true all evidence favorable to the nonmovant, and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id*. at 633. If the evidence creates a fact question

regarding jurisdiction, the plea must be denied pending resolution of the fact issue by the fact finder at trial. *Id*.

Because the jurisdictional issue here, the existence of state action, also implicates the merits of Millspaugh's case, we consider the relevant evidence submitted by the parties to determine if a fact issue exists. *See Suarez*, 465 S.W.3d at 632-33; *Miranda*, 133 S.W.3d at 227; *Poindexter*, 306 S.W.3d at 807. In so doing, we take as true all evidence favorable to Millspaugh, and indulge every reasonable inference and resolve any reasonable doubts in her favor. *See Suarez*, 465 S.W.3d at 633. If the evidence creates a fact issue regarding jurisdiction, then the trial court should have denied the plea to the jurisdiction pending resolution of the fact issue by the fact finder at trial. *See id*.

## DISCUSSION

In a single issue, Millspaugh argues the trial court erred in granting the plea to the jurisdiction and in dismissing her section 1983 claim because a fact issue exists about whether BSB Emergency Services acted under color of governmental authority in terminating her employment.

Millspaugh recognizes that, in light of the Fifth Circuit's decision in *Yeager*, the exclusive public function test is the most difficult test for her to satisfy. In *Yeager*, the Fifth Circuit rejected the argument that firefighting was an exclusive public function in Texas. 980 F.2d at 339. Acknowledging *Yeager*, Millspaugh argues that even if she cannot satisfy the exclusive public function test, she satisfies the other three state action tests. In analyzing this case, we will concentrate on the three remaining state action tests: (1) the nexus test, (2) the joint action test, and (3) the state compulsion test. To prevail on appeal, Millspaugh must show that a fact issue exists with regard to at least one of these state action tests.

We begin our analysis by examining the evidence regarding BSB Emergency Services and District 4's overall relationship. The evidence includes an article published in a local community guide in 2017. In the article, BSB Emergency Services characterizes itself as a "[o]ne-of-a-kind organization in the state, leveraging 3 Emergency Services Districts and Nonprofit *under one management structure* to efficiently & effectively manage our taxpayer[s'] dollars." (Emphasis added). The evidence also shows the guide's purpose was to demonstrate to taxpayers and residents what BSB Emergency Services does with the funds it receives. Additionally, the evidence shows BSB Emergency Services receives the vast majority of its funding, between 71% to 90%, from taxpayer revenues received through the Districts. Furthermore, the evidence shows overlap between BSB Emergency Services's board of directors and District 4's board of commissioners. At least two of the members on the board of directors for BSB Emergency Services also serve on District 4 as commissioners.[2]

Although the contract between BSB Emergency Services and the Districts states that BSB Emergency Services is an independent contractor, the contract reveals the private and governmental entities are closely connected. The contract, titled "Joint Agreement for Providing Emergency Services," provides that BSB Emergency Services shall provide medical emergency services and fire protection services to the residents, commercial interests, and others found within District 1, District 4, and District 5's service areas. The Districts allow BSB Emergency Services to use their facilities and equipment for providing emergency services. The facilities and equipment usage is comprehensive, including fire stations, ambulances, fire trucks, a boat, radio, hoses, pressure packs and other equipment. The contract requires BSB Emergency Services to insure all BSB Emergency Services and the Districts' facilities and other equipment. The contract

---

[2]Although Millspaugh argues that six of the nine members on the board of directors for BSB Emergency Services also serve as District commissioners, this is not established by the record before us.

grants BSB Emergency Services the discretion to summon mutual aid from other cities, towns, governmental entities, volunteer fire, and first responders when appropriate or as needed, but it also requires BSB Emergency Services to obtain written approval from each District for all such mutual aid agreements.

As to administrative services, the contract provides that BSB Emergency Services shall provide "basic administrative support for meetings of the Districts, including posting and distributing agendas, assisting in preparing minutes, preparing and filing required operational reports, and preparing monthly financial and disbursements report[s]." In addition, BSB Emergency Services is required to provide the Districts "secure records storage, records retention compliance, bookkeeping services and support for each annual audit review." Moreover, under the contract, BSB Emergency Services "shall deliver" to the District commissioners "monthly written reports setting forth the number and nature of Emergency Services calls for the prior month" and "monthly profit and loss reports, balance sheet and cash flow statements." Additionally, BSB Emergency Services "shall furnish or cause to be furnished to the Districts or any agents of the Districts such reports or information concerning BSB as the Districts may reasonably request." The contract further specifies that BSB Emergency Services's executive director is a liaison to the Districts for operational matters and legal and business matters.

As to purchasing, the contract requires BSB Emergency Services to request competitive bids on any expenditure exceeding $50,000.00 and gives the Districts the sole authority to award or reject any bid. With regard to billing, the contract sets out that the Districts are authorized to bill private insurance carriers and that the Districts intend for BSB Emergency Services to bill private insurance carriers on the Districts' behalf. The contract also requires BSB Emergency Services to report to the Districts about the funds collected from third parties, but it provides that the funds received from third parties will be maintained by BSB Emergency Services.

With regard to planning, the contract requires BSB Emergency Services to work with a council established by an interlocal agreement between District 1, District 4, and District 5 to develop and implement a five-year plan for the improvement of services within the Districts. BSB Emergency Services is also required to assist in updating a long-range plan annually and to present recommendations regarding the updated plan to the Districts no later than October of each year.

As to personnel, the contract provides that BSB Emergency Services "will maintain a personnel policy" "which must include policies addressing discrimination, sexual harassment, and chain of command." The personnel policy "must be made available to the Districts upon request." The contract also provides that BSB Emergency Services "shall maintain a personnel evaluation and review policy for the goal of satisfying the requirements under the contract," which also "shall be made available to the Districts." Additionally, under the contract, BSB Emergency Services is required to develop and implement programs "to ensure courteous, professional, and safe conduct of all Emergency Services personnel and other staff at all times." The contract further provides that BSB Emergency Services "may only utilize responsible, competent, and well-trained personnel."

Under the nexus test, courts determine if the state has inserted itself into a position of interdependence with the private actor such that it was a joint participant in the enterprise. *Cornish*, 402 F.3d at 550. Here, the evidence shows substantial interdependence between the BSB Emergency Services and the Districts. The Districts permit BSB Emergency Services to use their buildings and equipment. The Districts rely on BSB Emergency Services to perform functions integral to governing, such as posting and distributing meeting agendas, assisting in preparing minutes, preparing and filing required operational reports, and preparing financial and disbursements reports. Furthermore, BSB Emergency Services is required to furnish to the Districts or their agents any reports or information concerning BSB Emergency Services as the

Districts may reasonably request. The Districts also retain oversight over many important functions performed by BSB Emergency Services, including financial matters and large appropriations. Additionally, BSB Emergency Services and the Districts hold themselves out as being a "one-of-a-kind organization" that consolidates four entities (one nonprofit and three districts) under "one management structure." At a minimum, this evidence raises a fact issue about whether District 4 inserted itself into a position of interdependence with BSB Emergency Services.

Both parties acknowledge, and we agree, that notwithstanding the overall relationship between BSB Emergency Services and District 4, the most important factor under each of the state action tests is to what extent the governmental entity, District 4, was involved in the decision to terminate Millspaugh. The "inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel. Thus, the focal point is the connection between the [s]tate and the challenged conduct, not the broader relationship between the [s]tate and the private entity." *Perkins v. Londonderry Basketball Club*, 196 F.3d 13, 19-20 (1st Cir. 1999); *see also Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982) (recognizing that the state action inquiry "requires careful attention to the gravamen of the plaintiff's complaint;" state action occurs "only when it can be said that the [s]tate is *responsible* for the specific conduct of which the plaintiff complains.") (emphasis in original); *Cornish*, 402 F.3d at 550 ("The issue, however, is whether [the private entity] acted under color of state law in terminating [the plaintiff's] employment…."). Therefore, in addition to considering evidence about the "broader relationship" between BSB Emergency Services and District 4, we must also ascertain whether any evidence indicates that District 4 was involved in Millspaugh's termination.

The relevant evidence shows that, in September 2016, Barnett, a member of the board of directors for BSB Emergency Services and a District 4 commissioner, received an unsigned letter, asking whether he was "cheating the taxpayers of Comal County" and District 4 by underpaying

his property taxes. Copies of the letter were sent to other District 4 commissioners and other county officials. On September 14, 2016, at 8:19 p.m., Barnett emailed a copy of this letter to Nancy Wehrung, a member of the board of directors for BSB Emergency Services.

The same evening, at 8:33 p.m., Wehrung forwarded the letter to the executive director of BSB Emergency Services, Michelle Salmon, stating: "Here it is." Just ten minutes later, at 8:43 p.m., Salmon told Wehrung via email that she would "issue the letter of administrative leave immediately." Additionally, Salmon wrote: "Although we need to allow the event investigation to take place, please know that ANY employee or volunteer that targets a board member, employee or volunteer does not align with our core values." Wehrung forwarded Salmon's email to others, stating: "All, Please see [Salmon's] response to me notifying her of what happened and sending her the letter."[3]

In a separate email, sent at 9:43 p.m. the same night, Salmon informed Millspaugh that "*we have received a formal complaint against you*" and placed Millspaugh on administrative leave "effective immediately." (Emphasis added).

The next day, September 15, 2016, at 8:52 a.m., Deena Clausen, a District 4 commissioner, sent an email to Wehrung and Salmon stating:

> Nancy & Mechelle - here is the motion that we (ESD4) passed at our meeting last night regarding this investigation.
>
> "Motion to request an immediate investigation into the anonymous letter sent to Commissioner Bret Barnett, ESD 4, and copied to Donna Eccleston, Jen Crownover, Scott Haag, Kevin Webb, Sherman Krause and Paul Graf, to see if a BSBES employee was involved. And to provide written findings by 5:00 p.m., September 19, 2016."

Claussen also copied this email to District 4 commissioner Barnett, District 4's president, and District 4's secretary.

---

[3]The record before us does not reveal the recipients of Wehrung's forwarding email.

Four days later, on September 19, 2016, Salmon sent an email to Wehrung "[p]er our telephone conversation this morning." The email included a chronology of the events related to the Millspaugh investigation, from the time the initial complaint was received through the evaluation of punitive action with legal counsel. In the email, Salmon also wrote:

> In response to the motion passed by ESD4 to provide a response on the Investigation by 5 [p.m.] today, please be advised that we ascertained that a BSBES employee was involved. Please let me know if you would prefer to personally deliver this determination to ESD4 or if you would like me to forward a formal written notice before 5 [p.m.]

Finally, on September 30, 2016, Salmon sent an email to two District 4 commissioners, Barnett and Claussen, informing them that Millspaugh had been released from employment.

Again, as we consider this evidence, we must take as true all evidence favorable to Millspaugh and indulge every reasonable inference and resolve any reasonable doubt in her favor. *See Suarez*, 465 S.W.3d at 633. The evidence shows that, on the evening of September 14, 2016, the District 4 commissioners formally voted on and passed a motion directing BSB Emergency Services to investigate the source of the letter and to provide them with written findings in five days. The same evening, BSB Emergency Services's executive director, Salmon, placed Millspaugh on administrative leave. Salmon also informed Wehrung, a BSB Emergency Services board member, that "although we need to allow the event investigation to take place" employee conduct that "targets a board member" was unacceptable. Wehrung forwarded Salmon's response to other individuals. Next, on September 19, 2016, the date the written findings were due to District 4, Salmon sent an email to Wehrung asking whether she should prepare a formal report about the investigation mandated by District 4 or whether Wehrung would communicate the findings to District 4's commissioners. Thereafter, on September 30, 2016, Salmon sent an email directly to District 4 commissioners Barnett and Claussen informing them that Millspaugh had been released

from employment the previous day. In light of this evidence, we conclude a fact issue exists about District 4's involvement in the decision to terminate Millspaugh.

Under the joint action test, courts determine if private actors should be considered state actors because they are willful participants in joint action with the state or its agents. *Cornish*, 402 F.3d at 550. Under the state compulsion test, courts determine if a private actor's conduct is attributable to the state when the governmental entity exerts coercive power over the private entity or provides significant encouragement. *Id*. Here, District 4 voted on and passed a motion requiring BSB Emergency Services to conduct an immediate investigation into the letter and to provide District 4 with written findings. Almost immediately upon learning of this action, Salmon placed Millspaugh on administrative leave. Even before any investigation took place, Salmon also assured Wehrung via email that Millspaugh's conduct was unacceptable. Wehrung forwarded Salmon's response to others. Furthermore, Salmon was prepared to provide District 4 with the findings it had requested, and Salmon eventually sent an email to two District 4 commissioners informing them that Millspaugh had been terminated. This evidence indicates some degree of collaboration between District 4 and BSB Emergency Services with regard to Millspaugh's termination. Therefore, fact issues exist about whether BSB Emergency Services was a willful participant in joint action with District 4 or its agents, and whether District 4 exerted coercive power or provided significant encouragement, with regard to Millspaugh's termination.

We conclude fact issues exist concerning the application of the nexus test, the joint action test, and the state compulsion test. We further conclude fact issues exist about District 4's involvement in the decision to terminate Millspaugh.

## CONCLUSION

Because fact issues exist with regard to state action, we conclude the trial court erred in granting BSB Emergency Services's plea to the jurisdiction. We, therefore, reverse the trial court's

judgment insofar as it dismissed Millspaugh's section 1983 claim, and remand this case to the trial court for proceedings consistent with this opinion.

Karen Angelini, Justice